STATE OF CONNECTICUT *v.* JOAO Q. NUNES
(AC 18096)

Lavery, C. J., and Foti and Healey, Js.

Argued September 21, 2000—officially released February 13, 2001

*Alinor C. Sterling*, with whom, on the brief, was *Ira B. Grudberg*, for the appellant (defendant).

*Margaret G. Radionovas*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *David Zagaja*, assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Joao Q. Nunes, appeals from the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (4)[1] (count one), illegal possession of a controlled substance in violation of General Statutes § 21a-279 (c)[2] (count two) and illegal

[1] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (4) for a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to such person, without his consent, a drug, substance or preparation capable of producing the same . . . ."

The first count of the information alleges, inter alia, that the "defendant intentionally caused stupor, unconsciousness and other physical impairments and injury to another person by administering to that person, without her consent a controlled substance, specifically *chloral hydrate and temazepam.*" (Emphasis added.)

[2] General Statutes § 21a-279 (c) provides: "Any person who possesses or has under his control any quantity of any controlled substance other than a narcotic substance, or a hallucinogenic substance other than marijuana or who possesses or has under his control less than four ounces of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and for a subsequent offense, may be fined not more than three thousand dollars or be imprisoned not more than five years, or be both fined and imprisoned."

The second count alleges, inter alia, that "the defendant had in his possession and under his control without authorization a controlled substance, *chloral hydrate and temazepam.*" (Emphasis added.)

distribution of a controlled substance in violation of General Statutes § 21a-277 (b)[3] (count three).[4] On appeal, the defendant claims that the trial court improperly (1) denied his motions for a judgment of acquittal and for a directed verdict on the first and third counts of the information because the evidence was insufficient to establish beyond a reasonable doubt that the victim was drugged with temazepam, chloral hydrate or a combination of both, and (2) denied the defendant's motion to set aside the verdict as to counts one, two and three because the court improperly admitted testimony regarding alleged prior misconduct committed by the defendant. We reverse in part and affirm in part the judgment of the trial court.

The jury reasonably could have found the following facts. Between May and September, 1993, the victim[5] worked as a computer graphics artist with an East Hartford graphics firm. The firm had a contract with the Hartford police department to prepare a slide presentation about community policing. The defendant, a Hartford police officer since November 26, 1979, worked with the victim between May and August, 1993.[6]

---

[3] General Statutes § 21a-277 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marijuana, except as authorized in this chapter, may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

The third count alleges, inter alia, that "the defendant without authorization delivered a quantity of *chloral hydrate and temazepam to another person.*" (Emphasis added.)

[4] The jury returned a verdict of not guilty of one count each of sexual assault in the third degree in violation of General Statutes § 53a-72 (a) (1) (A) and sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (2).

[5] The victim was a nineteen year old female college sophomore.

[6] The defendant was the police department's liaison for the project. Aside from the victim's work with the defendant at the graphics firm, she saw

On or about September 7, 1993, after they had completed the project, the defendant telephoned the victim and asked if she would be interested in going out on a surveillance operation that involved the use of a new infrared camera that the police department had acquired.[7] After some convincing by the defendant, she agreed to meet him that evening.

At approximately 7 p.m. on September 7, 1993, the victim went to the defendant's office in the police department, at which time he began describing the department's new printer and computer. He wanted to show her how the printer worked and printed a picture. When it printed a picture of a woman who "was either naked or wearing a skimpy bathing suit," the victim became embarrassed and told him that she did not want to see the picture. After showing her the picture, he asked if she wanted something to drink. She initially declined, but then agreed to have some already prepared iced tea, which he took out of a small refrigerator in his office. She drank it within a few minutes.[8] Immediately after he gave her the iced tea, the defendant left the room to get a bulletproof vest for the victim to wear because they were going out on surveillance. The defendant then returned with the vest and told her to put it on.[9] About three to five minutes after drinking the iced tea, the victim began feeling "foggy," "sluggish" and "really dizzy."

The defendant and the victim then walked through a hallway to a classroom that contained gym mats. The

---

him only on a few occasions at the Hartford police department. She did not see the defendant on any other occasion or at any other place.

[7] The defendant telephoned the victim because he was aware that she was a criminal justice major, and had expressed interest in police work and the technology that police use.

[8] The victim stated that the iced tea did not taste or smell unusual.

[9] Although the victim asked to use the ladies' room, the defendant told her that she could put the vest on in his office. She did so, putting it on under her shirt without taking the shirt off.

defendant turned the lights off and started to show the victim how the infrared camera worked. She sat on a chair and, when he turned the lights on, he noticed that the victim looked pale. He suggested that she lie down on a mat. The defendant said that he had to speak to someone, and turned off the lights and left the classroom.

The next thing that the victim remembered was that she was lying on the mat, "fading in and out," "feeling very dizzy, foggy," and that "she knew something wasn't right." As she awoke, the defendant was at her right side. She no longer was wearing the bulletproof vest. The defendant then asked if he could kiss her and, although she refused, he kissed her anyway.

Next, the victim sat up and said that she wanted to go home. The defendant suggested, and the victim agreed, that he should drive her home because she was in no condition to drive herself. On the way to the victim's house, they stopped once to get soda. They stopped again because the victim felt sick and she vomited.

After she arrived home, the victim slept through the night until about 5:30 a.m., at which time her head had cleared and her stomach problem had disappeared. She then called her boyfriend and asked him to come to her home. When he arrived, he observed her "crying hysterically." She told him that she thought she had been drugged and sexually assaulted the night before. He took her to the East Hartford police department, but she refused to go inside, so they returned to her home. There, the victim told her mother what she believed had happened. Her mother suggested that she go to a hospital to find out what she had ingested. After contemplating her mother's advice, she went to the hospital that afternoon. While there, she told the hospital staff that she thought she had been drugged and

sexually assaulted, but denied that a rape had occurred.[10]

At the hospital, tests were performed on the victim's blood and urine. No alcohol was detected. Tests also were performed to determine whether she had ingested certain types of drugs; those tests were negative. Most notably, the tests were negative for benzodiazepines, which include temazepam,[11] one of the drugs the state charged the defendant with putting in the victim's iced tea. The other drug the state charged the defendant with putting in the victim's drink was chloral hydrate.[12] The hospital did not test for that drug. Temazepam and chloral hydrate are controlled substances.

Upon returning home from the hospital on September 8, 1993, the victim noticed that the defendant had telephoned her. She then telephoned him. When they spoke, she asked the defendant what he had put in her drink. She testified that his response was, "All kinds of good stuff."[13] She then told him that she knew something had happened and that he was not going to get away with it. She also informed the defendant that she was going to proceed further. That was her last contact with the defendant.

On September 10, 1993, she reported the incident to the East Hartford police, and met with Lieutenant Timothy Hogan and Sergeant Antonio Cancel of the Hartford police department. She gave them a tape-recorded statement that later was reduced to a written statement, which she signed. On September 14, 1993,

[10] The victim refused to have a pelvic and rape examination.

[11] Temazepam is a prescription tranquilizer that, according to expert testimony, may or may not be disclosed by a drug screen. Detection depends on the amount taken, and the time lapse between the time of ingestion and the time of testing.

[12] Chloral hydrate is a liquid drug that acts as a sedative or hypnotic. It is a central nervous system depressant.

[13] The defendant denied saying that when he testified.

Cancel and Sergeant Robert O'Connell of the Hartford police department informed the defendant that he was the subject of a criminal investigation generated by a complainant who claimed that she was drugged and sexually assaulted on September 7, 1993. Those officers then took a written statement from the defendant.

On September 14 and 15, 1993, the police officers seized certain materials[14] from the defendant's office in the Hartford police department. Those materials included: Two glasses, one found on a windowsill and one on a refrigerator; some iced tea mixture (brownish powder); a bulletproof vest; a bottle of chloral hydrate, which was found behind some files in the top drawer of a locked file cabinet; a Tylenol bottle containing some yellow capsules; a Nuprin bottle containing white pills, which was locked in a portion of the defendant's desk; and an eight millimeter radio cassette tape found inside a Canon video camcorder.

Upon testing,[15] the state forensic laboratory detected no narcotics or controlled drugs on the two glasses,[16] in the Tylenol bottle or in the brownish powder. The Nuprin bottle, however, contained a number of clear capsules that, according to the forensics tests, contained temazepam. Further, tests that were performed on the bottle labeled "chloral hydrate," disclosed that it did, in fact, contain chloral hydrate. Additional facts will be set forth as necessary.

I

The defendant claims that the evidence was insufficient to support his conviction on counts one and three,

[14] Those materials were taken from the defendant's office pursuant to search warrants.

[15] The tests were performed at the department of public health laboratory by Joel R. Milzoff, a forensic toxicologist and the health laboratory section manager of toxicology. Milzoff, along with James O'Brien, a physician and clinical pharmacologist, were the expert witnesses in this case.

[16] The hospital physicians had not tested for chloral hydrate.

the assault and illegal distribution charges, because it did not permit the jury to find that the victim actually ingested either temazepam, chloral hydrate or a combination of the two. We agree.

"[W]e have consistently employed a two-part analysis in appellate review of the sufficiency of the evidence to sustain a criminal conviction. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . That the evidence is circumstantial rather than direct does not diminish the probative force of that evidence. . . . We must be mindful, however, that [a]lthough the jury may draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture. . . . Each essential element of the crime must be proved beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Caprilozzi*, 45 Conn. App. 455, 463–64, 696 A.2d 380, cert. denied, 243 Conn. 937, 702 A.2d 644 (1997).

An essential element necessary to the jury's finding the defendant guilty on counts one and three was that the victim actually ingested temazepam, chloral hydrate or a combination of the two.[17] The defendant claims that the state failed to prove that beyond a reasonable doubt and, therefore, that this court should reverse the judgment of conviction as to counts one and three, and

[17] In its instructions regarding the *essential elements* of the crime of assault in the second degree, the court told the jury that the state must prove that "the drug . . . was temazepam or chloral hydrate or both. While the charge is written in what we call the conjunctive in that it uses an 'and,' the state only has to prove [that] one or the other of the substances [was involved]."

order that a judgment of acquittal be rendered as to those counts.[18]

In arguing that there was insufficient evidence, the defendant claims that the chemical test for temazepam in the victim's system was negative and, further, that the hospital did not even do a chemical test for chloral hydrate. He further claims that the expert medical testimony did not establish that the victim's symptoms could be attributed to temazepam, chloral hydrate or a combination of the two, with reasonable medical certainty.[19] In addition, he claims that the victim's alleged symptoms do not suffice to establish that she ingested temazepam, chloral hydrate or a combination of the two because the symptoms she described were "relatively commonplace." Therefore, a finding that the victim actually ingested one or both would, on the evidence, be speculative.

The state, on the other hand, claims that it proved beyond a reasonable doubt that the victim's symptoms were attributable to the drug or drugs ingested by the victim via the iced tea and, further, that the drug or drugs in question were chloral hydrate, temazepam or

[18] The defendant also claimed that the court improperly allowed certain testimony regarding an incident of prior uncharged sexual misconduct by the defendant. That evidence was offered to show his intent to commit the crimes charged in the first and third counts of the information. We do not need to address the substance of that issue because although intent is an essential element of certain of the crimes charged, so is the fact that the victim actually ingested the drug. Whether there was sufficient evidence for the jury to find that the victim *actually ingested* either or both of the drugs is dispositive as to counts one and three.

[19] The appropriate standard is the reasonable medical probability standard. See *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987); *Eisenbach* v. *Downey*, 45 Conn. App. 165, 178, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997). "An expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible." *Healy* v. *White*, 173 Conn. 438, 443, 378 A.2d 540 (1977).

both.[20] In claiming that either or both of those drugs were involved, the state relied heavily on the fact that the drugs were found in the defendant's possession within a "reasonably short time" following the alleged incident. The state also claims that the victim's symptoms were consistent with the effects of one or both of the drugs and[21] further maintains that lack of scientific evidence does not necessarily make evidence insufficient per se.

The state claims that "the fact that the medical testing [of the victim's blood and urine was] *inconclusive*[22] does not compel a conclusion that the evidence of the nature of the substance was insufficient" and cites several cases in support thereof. The state can hardly claim that the medical testing of the victim's blood and urine was merely "inconclusive" because, as to temazepam, the testing was negative and, as to chloral hydrate, there was no testing done.[23]

As for the state's argument that a lack of scientific evidence does not make its evidence insufficient per

[20] Although the state argues that the defendant administered the drug or drugs, we do not need to make such a determination in light of our conclusion regarding whether the victim actually ingested the drug or drugs.

[21] In its brief, the state argues that the evidence was sufficient to support the conviction and acknowledges "that most of its evidence focused on the effects of chloral hydrate, rather than the effects of the temazepam." The state, however, argues that this court need not decide whether the evidence was sufficient to prove that the victim ingested temazepam because where, as here, the charging document alleged the two drugs in the conjunctive, the state needs to prove the ingestion of only one of the drugs. See *State* v. *Wohler*, 231 Conn. 411, 415, 650 A.2d 168 (1994). The state, however, does not concede that its evidence was insufficient to permit the jury to infer that the victim ingested temazepam. It maintains that the fact that the medical tests on the victim's blood and urine were "inconclusive" does not compel a conclusion that the evidence of the nature "of the substance" was insufficient.

[22] "Inconclusive," when speaking of evidence, is defined as "not leading to a conclusive or definite result." Black's Law Dictionary (7th Ed. 1999).

[23] We recognize that the state laboratory did determine that the seized substances contained temazepam and chloral hydrate, but that does not change what the hospital testing disclosed.

se, expert testimony is necessary in the present case to show a connection between the symptoms and the drug or drugs allegedly ingested because such knowledge is not normally within the province of a jury. Moreover, the state itself clearly recognized the need for expert testimony in this case when it produced two expert witnesses, Joel R. Milzoff, a forensic toxicologist, and James O'Brien, a physician and clinical pharmacologist, as well as certain hospital and forensic records. That was in keeping with the purpose of offering the opinion of expert witnesses to aid the trier of fact in arriving at its own conclusion. We agree that there may be cases of a similar nature in which scientific evidence is unnecessary. The cases the state cites in support of its position are, however, unpersuasive.[24]

After a careful examination of the evidence, including that of the state's experts, we agree with the defendant that the state did not prove beyond a reasonable doubt that the victim ingested one or both of the drugs at issue.[25] Despite the testimony of Milzoff and O'Brien,

[24] The state refers to State v. Henning, 220 Conn. 417, 421, 599 A.2d 1065 (1991). Henning was a case of felony murder in connection with a burglary. In that case, the court cited uncontroverted expert testimony from Henry C. Lee, director of the state forensic laboratory, involving certain footwear imprints in the blood of the victim that were made during a struggle, as well as certain statements the defendant made to the police, his grandmother and his girlfriend. Id., 421–25. In Henning, there was forensic evidence to support the state's allegations. In the present case, there is no such evidence.

The state also cites People v. Wojahn, 169 Cal. App. 2d 135, 337 P.2d 192 (1959), in which there were no laboratory tests to prove that the victim ingested drugs, yet the court found that the evidence was sufficient. The prosecution in Wojahn, however, obtained a taped admission by the defendant in an undercover operation. There was no admission of that nature in the present case.

[25] There is no question that both experts, especially O'Brien, had much to say about both drugs and the symptoms consistent with their use, but no opinion was given with reasonable medical probability. Such an opinion is required so that, if accepted by the trier of fact, it will advance the trier's understanding of a material fact in issue as well as prevent the trier from relying on speculation or conjecture.

the state does not point to any expert testimony that may be fairly understood to meet the reasonable medical probability threshold.

We now turn to whether the state proved beyond a reasonable doubt that the victim ingested temazepam. We conclude that there is no evidence from which any rational trier of fact could find that the victim actually ingested that drug. Most notably, when she was tested for it, the test was negative.[26] The evidence was, therefore, insufficient to prove beyond a reasonable doubt that the victim actually ingested temazepam.[27]

We next turn to whether the state proved beyond a reasonable doubt that the victim actually ingested chloral hydrate. We conclude that the state presented no evidence that provided, with a reasonable degree of medical probability, a causal link between the victim's symptoms, as she testified about them, and any ingestion of chloral hydrate.

The fact is that the hospital did not test the victim for chloral hydrate. O'Brien testified that chloral hydrate is not a drug that is ordinarily tested for. Further, he stated that it would have been very rare in 1993 to test for

---

[26] The state in its brief argues that "[t]he jury reasonably could have concluded that the victim . . . ingested temazepam as well as chloral hydrate from (1) the fact that the victim's reaction to the substance(s) was as powerful and violent as it was, and (2) the defendant's [alleged] admission that he put '[a]ll kinds of good stuff' in her drink . . . ."

First, there is no evidence that the victim's reaction to temazepam was "powerful and violent," and there is no indication of a transcript citation to support that claim. Second, given the nature of the evidence viewed most favorably to the state, the statement, "[a]ll kinds of good stuff," attributed to the defendant by the victim, even if believed, hardly meets the criteria of proving that he was referring to temazepam or chloral hydrate.

[27] As stated in footnote 21, although the state does not concede that its evidence was insufficient to permit the jury to infer that the victim ingested temazepam, it did acknowledge that most of its evidence focused on the effects of chloral hydrate, rather than temazepam.

chloral hydrate[28] if a person complained of dizziness or lightheadedness.[29] As to whether chloral hydrate, tested for fourteen to fifteen hours after an alleged ingestion would necessarily show up on the test results, O'Brien testified that it would depend on the amount of the dosage. The state did not, however, present any evidence as to the amount of the dosage.

Furthermore, according to expert testimony, the victim's symptoms simply did not match those normally associated with the ingestion of chloral hydrate. According to O'Brien, chloral hydrate is a very irritating substance and has an orange odor; the victim claimed that it had no odor. O'Brien also testified that the onset of drowsiness when chloral hydrate is ingested occurs after perhaps fifteen minutes or twenty minutes. Drowsiness set in on the victim within three or five minutes. Medical testimony showed that a person becoming unconscious within five minutes is inconsistent with the ingestion of chloral hydrate, unless it was taken in large dosages. There was no evidence, however, as to how much the victim allegedly ingested.

Moreover, the victim's symptoms of grogginess, dizziness and lightheadedness were so common that, according to the expert testimony, many substances could have caused them. It seems clear that the only reason chloral hydrate was even brought up in this case was because it was found in the defendant's office seven days after the alleged incident. While we are aware that the trier of fact may draw reasonable and logical inferences from the facts proven, we conclude that the

---

[28] It is probable, O'Brien testified, that hospitals in 1993 would have tested for temazepam.

[29] Milzoff testified that chloral hydrate possibly could make a person lightheaded and groggy. He did not recall, from his experience, having heard that it makes people dizzy. O'Brien testified that chloral hydrate would not typically cause dizziness, but could do so with increased doses. There was no evidence as to how much the victim allegedly ingested.

evidence regarding the victim's ingestion of chloral hydrate can only amount to speculation and conjecture.

As for the last scenario, i.e., that the victim ingested temazepam and chloral hydrate together, the evidence also was insufficient. While there was some evidence of the effects of those two drugs taken alone, there was no evidence at all of the effects of those two drugs ingested in combination. While jurors could easily understand what takes place when one mixes tea with hot water and therefore would need no assistance in determining the results of such a mixture, determining the results of mixing temazepam and chloral hydrate is not within the province of the average juror. The state's experts did not address that issue. Therefore, the evidence was insufficient to prove beyond a reasonable doubt that the victim ingested both temazepam and chloral hydrate.

Even after construing the evidence in a light most favorable to the state and considering the reasonable inferences drawn therefrom, we cannot sustain the jury's verdict on the first and third counts. To arrive at such a verdict, the jury, in accordance with our analysis, would have had to rely on speculation and conjecture. We therefore reverse the judgment of conviction on the first and third counts, and direct the trial court on remand to render a judgment of acquittal on those counts.

II

The defendant also claims that the court improperly denied his motion to set aside the verdict as to counts one, two and three. Specifically, he claims that the court improperly admitted testimony regarding alleged misconduct committed by him and that such evidence was so prejudicial that he needed a new trial on count two. We disagree.

At trial, the court admitted certain testimony of a woman regarding a prior incident of uncharged misconduct against the defendant. The incident allegedly occurred several years before the incident in the present case. The defendant claims that the admission of the alleged prior misconduct evidence was so harmful as to prejudice him as to counts one, two and three despite the court's limiting instructions on such evidence.

The state argues that the first and third counts are at issue on appeal, not the second count. In so arguing, the state points out that it did not rely on the prior uncharged misconduct evidence to prove the second count. In fact, the prior misconduct evidence was admitted only as to the first and third counts. Further, in admitting such evidence as to only the first and third counts, the court instructed the jury that it could apply such evidence only on the issue of intent under those counts and that it could not consider such evidence as evidence of bad character or criminal propensity of the defendant.

As noted, the court instructed the jury on the limited purpose for which it was admitting the alleged misconduct testimony.[30] It is well established that "[j]urors are presumed to have followed the instructions of the court as to the law in the absence of a clear indication to the contrary." *State* v. *Sauris*, 227 Conn. 389, 403, 631 A.2d 238 (1993); *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). There is no such indication on this record. "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. *Richardson*

---

[30] The court instructed the jury on two separate occasions. The last time it did so was during its final instructions to the jury.

v. *Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 626, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). Therefore, the prior misconduct evidence cannot properly be considered the subject of a claim of error as to the second count.

The judgment of guilty is reversed as to the first and third counts and the case is remanded with direction to render a judgment of acquittal on those counts. The judgment is affirmed as to count two.

In this opinion the other judges concurred.