## STATE OF CONNECTICUT *v.* THADDEUS TAYLOR
### (AC 17168)

Lavery, C. J., and Spear and Daly, Js.

Argued December 14, 2000—officially released May 15, 2001

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Eugene R. Calistro, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Thaddeus Taylor, appeals from the judgment of conviction, rendered after a jury trial, of three counts of assault of an employee of the department of correction[1] in violation of General

---

[1] The defendant was acquitted on a fourth count of assault of an employee of the department of correction.

Statutes (Rev. to 1995) § 53a-167c.[2] The defendant claims that the court improperly (1) ordered, without first holding a hearing, that he be restrained with leg shackles throughout the proceedings, (2) accepted his waiver of his right to counsel without performing an adequate canvass, (3) failed to ensure that he had access to a law library prior to and during the proceedings, (4) denied his motion to dismiss the assault charges because the proceedings violated the Interstate Agreement on Detainers (IAD), General Statutes § 54-186 et seq., and (5) interpreted General Statutes (Rev. to 1995) § 53a-167c (b) as requiring the imposition of a consecutive rather than a concurrent sentence for the assault conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant was arrested on July 24, 1996, for assaults of correction department employees after he was involved in an altercation with several correction officers at the New Haven Correctional Center. At that time, he was a sentenced federal prisoner en route to a federal prison in Otisville, New York. The defendant was temporarily transferred to the custody of Connecticut for the resolution of other outstanding charges against him in Enfield and Bridgeport,[3] and was being housed at the New Haven Correctional Center between court appearances.

In late August, 1996, after being arraigned on the assault charges in New Haven, the defendant was transferred back to federal custody and taken to the prison

---

[2] General Statutes (Rev. to 1995) § 53a-167c (a) provides in relevant part: "A person is guilty of assault of a[n] . . . employee of the department of correction . . . when, with intent to prevent a reasonably identifiable . . . employee of the department of correction . . . from performing his duty, and while such . . . employee . . . is acting in the performance of his duties, (1) he causes physical injury to such . . . employee . . . ."

[3] Those charges are not at issue in this appeal.

in Otisville, New York. He was returned to Connecticut on December 3, 1996, for trial on the New Haven assault charges and for the Bridgeport case, which was still pending. The Bridgeport case ended in a mistrial. Thereafter, the New Haven charges were resolved in a jury trial lasting from January 21 to February 7, 1997. The defendant acted pro se throughout the proceedings in both Bridgeport and New Haven. The New Haven jury found him guilty of three counts of assault of a correction officer.

On April 11, 1997, the court sentenced the defendant to twelve years imprisonment, suspended after six years, and five years probation. The court, after considering that it lacked the discretion to order otherwise, held that this sentence was to run consecutively, rather than concurrently, to the term that the defendant already was serving in federal prison. Additional facts will be set forth where pertinent to the claim being addressed.

I

The defendant first claims that the court abused its discretion in ordering, without holding a hearing, that he wear leg shackles throughout the proceedings.[4] He

[4] The defendant argues further that the court improperly allowed to be in the courtroom two correction officers wearing bulletproof vests and that the officers' presence violated his right to a fair trial before an impartial jury. The defendant objected several times to the court's order that he be shackled and, therefore, clearly preserved that issue for our review. The defendant did not object, however, to the presence of the correction officers in the courtroom and now requests review pursuant to the doctrine enunciated in *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Because the record does not reveal whether the correction officers were

argues that being shackled infringed on his state and federal constitutional rights to a fair trial before an impartial jury by unnecessarily suggesting that he was dangerous and implying that he was guilty of the charges against him. He claims further that the shackles interfered with his right to represent himself at trial because they limited his movement and deprived him of the full use of his faculties. We disagree with each of those claims.

The following additional facts are relevant to those claims. The defendant initially was brought to court for pretrial proceedings in both leg shackles and handcuffs. On January 13, 1997, prior to the start of jury selection, the court granted the defendant's request to remove the handcuffs but, due to security considerations, denied his request to remove the leg shackles. The trial was being held in a wing of the courthouse that normally was used for civil trials. There was a domestic relations courtroom nearby and, accordingly, many people were present in the hallways. Further, the courtroom in which the defendant was being tried had several entrances that could not adequately be secured.

Responding to the defendant's concerns that the shackles would leave a negative impression with the jury, the state's attorney constructed skirts around both the defense and prosecution tables, and suggested that both sides remain seated while presenting their cases. Alternatively, the state's attorney suggested that the defendant's standby counsel could present evidence to the jury while the defendant remained seated at the table. The defendant rejected both of those options. The jury panel was summoned, and the parties proceeded to voir dire.

present throughout trial, whether they were wearing the bulletproof vests throughout trial or what effect they may have had on the jury, the first prong of *Golding* is unsatisfied and, accordingly, we decline to address that claim. See *State* v. *Woolcock*, 201 Conn. 605, 618, 518 A.2d 1377 (1986).

The defendant pointed out his shackles to the first prospective juror, who ultimately was dismissed. The court proceeded to instruct subsequent panel members, before they were questioned, that the fact that the defendant was wearing shackles meant nothing and ought not to weigh in the determination of whether he was guilty of the charges against him.[5] During voir dire, the defendant asked each prospective juror if he or she had any opinion regarding the shackles, and each responded that the shackles would not influence his or her judgment regarding the defendant's guilt. Some said they had not noticed the shackles until they were pointed out or that they thought they were standard procedure.[6] A jury was selected and the trial proceeded

---

[5] For example, the court instructed the first juror chosen as follows: "[Y]ou might have seen that [the defendant] had some restraints on his legs . . . . The fact that he is in leg irons should in no way affect your decision, it shouldn't affect your evidence, it shouldn't affect your deliberations, okay?" The juror responded, "I didn't even know he was, Your Honor."

[6] The following is a synopsis of the colloquies between the defendant and the prospective jurors who ultimately were selected for the panel:

"Q. . . . Now, the court indicated I got shackles on my feet, what is your—how do you feel about that?

"A. I have no opinion on that whatsoever. I mean, you know, that's part of their rules as far as I know. . . .

"Q. You wouldn't use that one way or the other against me?

"A. No.

"Q. You understand that you can't, right?

"A. No. I have no opinion on your shackles at all. I didn't even know you had them on until the judge said it."

* * *

"Q. . . . Does it offend you that you see I have shackles on? . . . Do that bother you?

"A. No.

"Q. Do you wonder why I have them on?

"A. Not really. . . . No."

* * *

"Q. . . . [Y]ou see I got shackles on. Do you know why I have them on?

"A. Because you were arrested, I assume.

"Q. Do that—Do that bother you?

"A. No.

"Q. Do you feel threatened?

"A. No.

to conclusion. In its charge to the jury, the court again instructed it not to consider the shackles as any indication of the defendant's guilt.[7] The jury returned a verdict of guilty on three counts of assault of a correction officer. At his sentencing hearing, the defendant made

"Q. Just because I was arrested do you feel that I was guilty because of the fact that I was arrested?

"A. No."

\* \* \*

"Q. . . . [D]o you have a problem with me being in shackles?

"A. No.

"Q. Do you have an opinion?

"A. No.

"Q. Do you have a—do you know why I'm shackled?

"A. No.

"Q. Are you—Do you feel afraid of that?

"A. No.

"Q. Are you afraid of me now?

"A. You seem like a pretty nice person just judging by this."

\* \* \*

"Q. You see I have shackles on me today—

"A. Well, I didn't see that and I didn't notice it if the judge hadn't told us earlier. I see it now, yes.

"Q. How do that make you feel?

"A. It doesn't change the way I would feel. I'm an open person, I'm willing to listen to testimony and I wouldn't prejudge a person by his appearance, jewelry, shackles or whatever it be. I would like to think that I am an open-minded person."

\* \* \*

"Q. I have shackles on my feet. How do you feel about that?

"A. I have nothing to say.

"Q. How does it make you feel? Do you feel threatened now?

"A. No."

\* \* \*

"Q. . . . [W]ould you hold that against me, that I am shackled?

"A. No.

"Q. I am shackled on my—

"A. I didn't even notice it until the judge mentioned it."

[7] The relevant part of the court's instruction was as follows: "For that matter, the fact that [the defendant] was an inmate in the New Haven Correctional Center in jail, that is not to be taken by you as any indication of whether or not he is guilty of these crimes. The fact that he is shackled with leg irons in court has nothing to do with whether or not he is guilty of these crimes and should not be considered by you as any indication of guilt of these crimes."

a motion for a new trial on the basis of, inter alia, the shackling. The court denied his motion and sentenced him as previously discussed.

## A

The defendant claims that being shackled deprived him of his state and federal constitutional rights to a fair trial before an impartial jury.[8] He also claims that the court improperly failed to hold a hearing on the matter. We disagree.

"As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . 'The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.' *Estelle* v. *Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976). . . . Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. . . . A trial court may employ a 'reasonable means of restraint' upon a defendant if, exercising its broad discretion in such matters, the court finds that restraints are 'reasonably necessary' under the circumstances. Practice Book § 892 [now § 42-46] . . . ."[9] (Citations omitted; internal

[8] "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment [to the United States constitution] . . . and is also safeguarded by article first, §§ 8 and 9, of the Connecticut constitution." (Citation omitted; internal quotation marks omitted.) *Sekou* v. *Warden*, 216 Conn. 678, 691, 583 A.2d 1277 (1990). Because the federal and state constitutions impose similar due process limitations on the court, we consider the defendant's claims together. Id., 690 n.7.

[9] Practice Book § 42-46 provides: "(a) Reasonable means of restraint may be employed if the judicial authority finds such restraint reasonably necessary to maintain order. If restraints appear potentially necessary and the circumstances permit, the judicial authority may conduct an evidentiary

quotation marks omitted.) *State* v. *Tweedy*, 219 Conn 489, 505, 594 A.2d 906 (1991).

"In reviewing a shackling claim, our task is to determine whether the court's decision to employ restraints constituted a clear abuse of discretion. . . . While appellate review is greatly aided when a court develops the record by conducting an evidentiary hearing concerning the necessity for restraints, 'such a hearing is not mandatory.' . . . A record in some fashion disclosing the justification for using restraints, however, is essential to meaningful appellate review of a shackling claim. . . . This is particularly so because of the potential for prejudice in the use of shackles. . . . Accordingly, a trial court must ensure that its reasons for ordering the use of restraints are detailed in the record." (Citations omitted; internal quotation marks omitted.) Id., 506.

A court may consider a variety of factors when exercising its discretion to order that a defendant be shackled. "In view of the fact that the law enforcement personnel at our courthouses are responsible for and possess superior experience in matters of courtroom security, it is practicable for a court to rely heavily upon the advice of such personnel in determining whether a criminal defendant should be restrained. . . . A court

hearing outside the presence of the jury before ordering such restraints. The judicial authority may rely on information other than that formally admitted into evidence. Such information shall be placed on the record outside the presence of the jury and the defendant given an opportunity to respond to it.

"(b) In ordering the use of restraints or denying a request to remove them, the judicial authority shall detail its reasons on the record outside the presence of the jury. The nature and duration of the restraints employed shall be those reasonably necessary under the circumstances. All reasonable efforts shall be employed to conceal such restraints from the view of the jurors. Upon request, the judicial authority shall instruct the jurors that restraint is not to be considered in assessing the evidence or in the determination of the case."

may also consider other information not in evidence, including official records, information supplied by correctional officers and attorneys, and facts generally known within the limits of its jurisdiction. . . . Such information or knowledge, however, should be placed on the record outside the presence of the jury and the defendant given the opportunity to respond to that information." (Citations omitted; internal quotation marks omitted.) Id., 506–507.

Many courts rejecting claims of improper restraint of criminal defendants in the courtroom have held that the trial court, in exercising its discretion, properly considered the lack of security at the facilities. See, e.g., *Patterson* v. *Estelle*, 494 F.2d 37, 38 (5th Cir.) (defendant being tried in courtroom with several exits that could not adequately be guarded), cert. denied, 419 U.S. 871, 95 S. Ct. 130, 42 L. Ed. 2d 110 (1974); *People* v. *Burnett*, 251 Cal. App. 2d 651, 653, 59 Cal. Rptr. 652 (1967) (trial conducted in nonsecure, temporary quarters while courthouse undergoing repairs); *People* v. *Boose*, 66 Ill. 2d 261, 267, 362 N.E.2d 303 (1977) (nature, physical security of courtroom one of several factors properly considered); *People* v. *Rouse*, 167 App. Div. 2d 854, 854, 562 N.Y.S.2d 256 (1990) (courtroom had five exits, insufficient security to guard them), aff'd, 79 N.Y.2d 934, 591 N.E.2d 1172, 582 N.Y.S.2d 986 (1992); *State* v. *Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353 (1976) (nature, physical security of courtroom one of several factors properly considered); *Commonwealth* v. *Jasper*, 531 Pa. 1, 12, 610 A.2d 949 (1992) (proceedings held on Sunday when court lacked usual security).

Courts also have found that the prejudicial effects of shackling were negligible where the defendants were being tried for offenses such as escape from prison or assault of a prison guard. That is because the nature of the charges and the evidence presented would inevitably have conveyed to the jury that the accused already

was a convict and a prisoner. See, e.g., *Tucker* v. *State*, 336 Ark. 244, 248, 983 S.W.2d 956 (1999) (affirming conviction for murder of fellow inmate); *State ex rel. Miller* v. *Henderson,* 329 So. 2d 707, 712 (La. 1976) (affirming conviction for attempted escape); *Commonwealth* v. *Brown*, 364 Mass. 471, 480, 305 N.E.2d 830 (1973) (affirming conviction for assault of correctional officer).

Here, the court properly based its decision to order that the defendant be shackled on the knowledgeable advice of the sheriffs in the courthouse and on its repeated observation that the trial was being held in a nonsecure arena. Although it did not hold a hearing, the court detailed those reasons on the record. The defendant was allowed to respond to the court's concerns each time, although the court ultimately rejected his arguments. Further, the court was aware of the violent nature of the crimes of which the defendant was accused and the fact that he allegedly had committed them in a correctional setting,[10] and it rightly considered that as one of several factors in making its decision. See *Sekou* v. *Warden,* 216 Conn. 678, 692, 583 A.2d 1277 (1990).

We note that the court and the prosecution made every attempt to conceal from the jury the fact that the defendant was wearing shackles by constructing skirts for the tables and offering to adjust the format of the trial accordingly. The defendant rejected those efforts and, in fact, drew attention to the shackles himself during voir dire. He now claims that it was inevitable that the jury would notice his shackles and draw negative inferences, but that assertion is belied by the jurors' responses to his questioning on the matter. Many stated that they had not noticed the shackles before the defen-

[10] Additionally, the court was aware that another of the defendant's pending cases involved charges that he had set fire to his cell.

dant drew them to their attention. Some jurors expressed a belief that they were standard operating procedure in a criminal trial. See footnote 6.

Furthermore, the nature of the charges against the defendant made it inevitable that the jury would become aware during the proceedings that he was a sentenced federal prisoner who was in Connecticut to face additional charges at the time of the alleged assaults. Given that the defendant was charged with attacking guards while he was incarcerated, "it is not unreasonable to assume that the jury would naturally expect that, when a defendant inmate appear[s] in court, adequate security measures would be taken . . . ." *State* v. *Williams*, 195 Conn. 1, 10 n.7, 485 A.2d 570 (1985). In light of the facts and the charges against him, any effect that the shackles may have had on the jury's impression of the defendant was negligible.

Last, the court gave curative instructions, both during voir dire and before jury deliberations, directing the jurors that the shackles were of no consequence. See footnotes 5 and 7. There is no evidence in the record that rebuts the presumption that the jury listened to and followed the court's curative instructions.[11]

We therefore conclude that the court did not abuse its discretion in ordering that the defendant remain shackled throughout the proceedings.

B

The defendant also argues that being shackled interfered with his right to self-representation.[12] We disagree.

[11] "It is well established that '[j]urors are presumed to have followed the instructions of the court as to the law in the absence of a clear indication to the contrary.' *State* v. *Sauris*, 227 Conn. 389, 403, 631 A.2d 238 (1993); *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992)." *State* v. *Nunes*, 61 Conn. App. 668, 682, 767 A.2d 181 (2001).

[12] The right to self-representation is guaranteed by the sixth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. *State* v. *Townsend*, 211 Conn. 215, 218 n.1, 558 A.2d 669 (1989).

In its recent holding in *State* v. *Shashaty*, 251 Conn. 768, 742 A.2d 786 (1999), cert. denied, 529 U.S. 1094, 120 S. Ct. 1734, 146 L. Ed. 2d 653 (2000), our Supreme Court addressed a defendant's claim that being shackled violated his right to self-representation. The court rejected that claim, noting that a "defendant's decision to proceed pro se does not vitiate the trial court's ability to employ a reasonable means of restraint upon [the] defendant if, exercising its broad discretion in such matters, the court finds that restraints are reasonably necessary under the circumstances." (Internal quotation marks omitted.) Id., 787. Moreover, the court found that there was "no showing that the shackles denied the defendant 'actual control over the case he [chose] to present to the jury.' " Id., 787–88. Accordingly, the court found no abuse of discretion. Id.

Similarly, the defendant in the present case has made no such showing. He argues only that the shackles embarrassed him and restricted his freedom of movement. The record reveals that he was able to stand, move around the courtroom, call witnesses, introduce evidence, object to the state's evidence and direct the witnesses' attention toward portions of a videotape. He had full use of his hands to gesture and take notes. The defendant's case strategy largely consisted of attempting to impeach the credibility of witnesses, and he has not argued that the shackles impaired his ability to do that. Nor does he say how he would have presented his case differently had the restraints been removed. The defendant has not shown that he lacked actual control over the case he presented to the jury. Accordingly, we conclude that the court did not abuse its discretion in ordering that the defendant remain shackled throughout the proceedings.

## II

The defendant next claims that his waiver of counsel was ineffective because the court did not properly can-

vass him pursuant to Practice Book § 44-3 to ensure that his waiver of the right to counsel was voluntary and intelligent. Specifically, the defendant argues that the court never cautioned him regarding the dangers of self-representation. See Practice Book § 44-3 (4). Alternatively, the defendant claims that even if the court's canvass was adequate, he conditioned his waiver on having access to a law library. We disagree with each of those claims.

At the defendant's July 26, 1996 arraignment for the assault charges in New Haven, the defendant, who already had been proceeding pro se in his case in Bridgeport, informed the court that he wanted to proceed pro se in New Haven as well. Attorney Shawn G. Tiernan of the public defender's office had been appointed to represent the defendant at that hearing and subsequently was dismissed. The court, *Lager, J.*, did not canvass the defendant regarding his waiver of counsel, stating that it more appropriately would be done in future proceedings. In a motion dated August 8, 1996, the defendant requested the appointment of standby counsel and, on August 23, 1996, the court, *McMahon, J.*, granted his request. At the January 13, 1997 pretrial proceedings, held to address several motions that the defendant had filed,[13] the court, *Clark, J.*, noted that the defendant had decided to proceed pro se and that standby counsel had been appointed.[14] The court verified that the defendant could read. The court proceeded to read to the defendant the statute under which he had been charged and explained to him the sentence to which he was exposed. In response to the court's query about whether he understood that information, the defendant answered affirmatively. The court also determined that the defendant recently had been evalu-

[13] At that point in the proceedings, the defendant already had filed some thirty motions.

[14] The court had notes of the earlier proceedings but not transcripts.

ated and judged competent in connection with the proceedings in Bridgeport.

The court then asked the defendant whether Judge Lager had advised him about his right to counsel and the defendant replied, "Yes, sir." The court then asked him whether he had been read the provisions of the rules of practice regarding his waiver of that right, referring generally to their content.[15] The defendant replied that it was "[his] best recollection [that] it was absolutely clear that [he] wanted to go pro se." The court also discussed with the defendant the provisions of the rules of practice that explain the duties of standby counsel, which the defendant said that he understood.

The court then asked the defendant to answer questions about himself, explaining that "even though it's been made sure in Judge Lager's mind, but just to make sure in my mind that you're competent to defend yourself." The defendant told the court that he had three and one-half years of college education, a similar amount of experience as a Connecticut correction officer and that he had served in the National Guard. The court remarked "that [the defendant] seem[ed] to be competent to represent [him]self" and, accordingly, found that he was competent to do so. Throughout the January 13, 1997 hearing, the defendant argued clearly and coherently in support of a number of his motions and evinced a solid understanding of court procedures.

---

[15] The following colloquy occurred:

"The Court: And—and [Judge Lager] read the Practice Book sections to you concerning the—these rights, and—and you waived your rights to have counsel, which is—which is your absolute right under our law. And I assume that she talked to you about your education, your mental ability, your experience, and that you understood the nature and grav[ity] of the charges, and the possible punishments and the disadvantage of trying to represent yourself; I assume that she explained all of this to you which is what's required by the Practice Book and the case law.

"[The Defendant]: Your Honor, my best recollection it was absolutely clear that I wanted to go pro se."

On January 14, 1997, the pretrial proceedings continued. Directly after the lunch recess, the court stated, apparently referring to an earlier off-the-record discussion, "Now, just to reiterate a little bit, we spent time discussing the obligations and rights to represent oneself, and the pitfalls of doing that. And we viewed the matter of [*State* v. *Day*, 233 Conn. 813, 661 A.2d 539 (1995), regarding competency to proceed pro se], as well as the Practice Book sections."

On January 21, 1997, after a jury had been selected, the court again made an effort to assure itself that the defendant was competent to continue representing himself, reiterating what it already had conveyed and warning the defendant of the dangers of self-representation. The defendant again chose to continue pro se.[16]

"There is no question that a defendant in a criminal matter has the right to represent himself and waive the assistance of an attorney. [Id., 820]. He properly exercises this right of self-representation by knowingly and intelligently waiving his right to representation by

---

[16] The following colloquy occurred:

"The Court: And now, Mr. Taylor, you have the right to your own counsel, and the right to represent yourself at any stage of these proceedings, and I too am satisfied so far, I am satisfied that you have been clearly advised of your right to [counsel], and I certainly have advised and or have just now advised on that. Is that not correct?

"[The Defendant]: Yes.

"The Court: I have to decide whether or not you possess the intelligent capacity to appreciate the consequences of representing yourself. I told you what the statute requires. I told you what the possible punishments were and the problems you are going to have with questioning witnesses.

"You know you are going to have to obey all the rules of evidence, which takes some doing for someone who has gone through three years of law school and pass[ed] the bar. The other thing is that it is rather difficult to [be] both your attorney and the party because you don't think objectively as such when you are that involved. Do you understand that?

"[The Defendant]: Yes.

"The Court: Now, having explained all this to you again, do you still want to represent yourself?

"[The Defendant]: I do wish to represent myself . . . ."

counsel. Id., 821. Several criteria must be met, to the satisfaction of the trial court, before a defendant in a criminal case may properly be allowed to proceed pro se, as set forth in Practice Book § 44-3. *State* v. *Webb*, 238 Conn. 389, 429, 680 A.2d 147 (1996). The waiver of counsel will be allowed only after the trial court makes a thorough inquiry and is satisfied that the following four conditions are met: The defendant (1) has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel if he is so entitled, (2) possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself, (3) comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case, and (4) has been made aware of the dangers and disadvantages of self-representation. Practice Book § 44-3." *State* v. *Copp*, 54 Conn. App. 695, 702, 736 A.2d 941, cert. denied, 252 Conn. 901, 743 A.2d 615 (1999).

The defendant does not claim that his waiver of counsel was not knowing, voluntary and intelligent, but only that the court's canvass was not adequate to ascertain a valid waiver. "[A] defendant, however, does not possess a constitutional right to a specifically formulated canvass. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing. . . . In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § 961 if the record is sufficient to establish that the waiver is voluntary and knowing." (Citation omitted.) *State* v. *Webb*, supra, 238 Conn. 429; see also *State* v. *Wolff*, 237 Conn. 633, 653–58, 678 A.2d 1369 (1996).

"Some of the factors bearing on the defendant's capacity include age, education, mental health, prior experience with criminal trials and consultation with counsel prior to proceeding pro se, although none of these inquiries is a constitutional necessity. . . . However, a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . Rather a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver." (Citations omitted; internal quotation marks omitted.) *State* v. *Oliphant*, 47 Conn. App. 271, 277–78, 702 A.2d 1206 (1997), cert. denied, 244 Conn. 904, 714 A.2d 3 (1998).

"The fact that the defendant's decision to represent himself was misguided or based on his erroneous perceptions of . . . his own ability to defend himself and resulted in a conviction is of no consequence. We review the record to determine whether the trial court properly concluded that the defendant was competent to make the decision to waive counsel, and that his decision was made in a knowing, voluntary and intelligent fashion. *State* v. *Day*, supra, 233 Conn. 822." *State* v. *Copp*, supra, 54 Conn. App. 703.

On January 13, 1997, the court encountered, by all appearances, a competent and knowledgeable pro se defendant. The court knew that he had been representing himself in Bridgeport. The defendant had the chance to confer with court-appointed counsel before he directed the dismissal of that counsel. Further, the defendant already was deeply enmeshed in self-representation in the New Haven case, filing a large number of pretrial motions and, presently, coherently arguing in support of several of them. The court, understandably, believed the defendant when he stated that he had been canvassed on his waiver of counsel in the prior proceed-

ings. Nonetheless, the court engaged in a fairly thorough discussion with the defendant to convince itself that the defendant was competent and that his waiver was valid.

The court discussed the charges against the defendant, reading him the relevant statute and verifying that he understood it and the sentence to which he was exposed. The court inquired about the defendant's educational background, ascertaining that he had nearly completed college. It was apparent that the defendant knew that he had the right to have counsel appointed in that he had dismissed earlier public defenders and secured standby counsel. The court remarked on the record that it was satisfied as to the defendant's competence to represent himself. It is clear from the record, and the defendant does not contest, that the first three requirements of Practice Book § 44-3 thus were met on January 13, 1997.

The defendant argues that the court failed to apprise him of the dangers of self-representation, as directed by Practice Book § 44-3 (4). We note that the transcript of January 14, 1997, indicates that this was discussed off the record and that the court clearly conveyed to the defendant the warnings regarding the pitfalls of proceeding pro se, on the record, prior to the start of evidence on January 21, 1997. Because our case law has established that literal compliance with the rules of practice, i.e., a specifically formatted canvass covering all four subsections of Practice Book § 44-3, is not required for a court to find a valid waiver of the right to counsel, we are unconvinced that any delay in the delivery of the warning in subsection (4) rendered the court's inquiry inadequate.

The defendant also claims that the court's acceptance of his waiver of counsel was improper because that waiver was conditioned on his having access to a law library. As discussed more fully in part III, the defendant

repeatedly complained to the court, throughout the pretrial proceedings and the early days of trial, that he needed access to a law library. The court initially ordered that access be granted, but vacated that order midtrial, on January 31, 1997, when it learned that access was neither feasible nor, apparently, legally required. The defendant continued to represent himself after the court vacated the order. He remained pro se to the conclusion of the trial and also at his sentencing hearing.

"[A] waiver of the right to counsel must be clear and unequivocal. *Faretta* v. *California*, [422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)] . . . ." (Citations omitted.) *State* v. *Day*, supra, 233 Conn. 829. "When a defendant's assertion of the right to self-representation is not clear and unequivocal, recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court." *State* v. *Carter*, 200 Conn. 607, 613–14, 513 A.2d 47 (1986).

It is clear from the record that the defendant, from his experiences in other correctional facilities, believed that he would have access to a law library. He was insistent about his desire to use a law library until the court vacated its access order.[17] It also is clear that the defendant waived his right to counsel unconditionally at the start of the proceedings. The defendant accompanied a subsequent reassertion of his desire to proceed pro se[18] with a reiteration of his need to use a law library, but did not explicitly condition the former on

[17] The prison officials opposed the order the entire time it was in effect; as such, they never permitted the defendant to use the library.

[18] The defendant briefly reasserted his right to counsel on January 21, 1997. On January 22, 1997, the court granted a continuance to allow his standby counsel to prepare to take over. By the opening of court on January 23, 1997, the defendant had informed his counsel that he did not trust him and wanted him dismissed. The court accepted the defendant's reassertion of his right to represent himself, and counsel again assumed the role of standby.

the latter. Though proximate in time, the defendant's expressions of the desire to proceed pro se and the need to use the law library were independent of one another. We emphasize that the defendant chose to continue with self-representation even after it was established definitively that library access was not forthcoming. That evidences the defendant's inclination to proceed pro se in any event. The court, therefore, did not abuse its discretion in allowing the defendant to exercise his right to represent himself.

After our review of the record, we conclude that the court properly determined that the defendant competently made the decision to proceed pro se, and made his decision knowingly, voluntarily and intelligently.

### III

The defendant next claims that, because he did not have access to a law library while preparing for trial, his right to self-representation was infringed. See footnote 12. He argues that the appointment of standby counsel was insufficient to rectify that constitutional defect. We disagree.

The following additional facts are relevant to this issue. While he was in Connecticut to be tried on the charges at issue in this appeal, the defendant was held at Northern Correctional Institution (Northern), a maximum security facility. He complained repeatedly throughout the proceedings that he did not have access to a law library at Northern.[19] The court initially ordered that the defendant have access to a law library, but later vacated that order on January 31, 1997, after hearing testimony from Margaret Q. Chapple, assistant attorney general, and John J. Armstrong, commissioner of correction. Chapple testified as to the security situation at

---

[19] Northern apparently has only a small collection of legal materials and a policy that they may be used by death row inmates only, for security reasons.

Northern and why the defendant was being housed there. She noted that the institution had some law books, but not a formal library. She explained that, because of the defendant's history of violent and disruptive behavior and his past employment as a correction officer, a transferral to a less secure facility with greater library resources was not advisable. Chapple emphasized the importance of leaving to the department of correction the discretion over where to house prisoners and how to manage its facilities. She noted that this discretion would be undermined by courts ordering that library access be given to certain defendants.

Armstrong also spoke of the security level at Northern and about the types of prisoners housed there. He noted that there was only a loose collection of legal reference materials at Northern and that they were not maintained or kept up to date. He explained that it was not a formal, staffed library and that only death row inmates were permitted access to the materials. Armstrong also explained why the defendant was considered a high security risk. After considering the testimony and the current case law, the court vacated the order allowing the defendant access to a law library.

We decline to analyze at length the issue of whether an incarcerated pro se defendant must have access to a law library because it was recently addressed by our Supreme Court in *State* v. *Fernandez*, 254 Conn. 637, 758 A.2d 842 (2000), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001). In that case, the court held that neither the sixth nor the fourteenth amendments to the United States constitution, nor article first, § 8, of the constitution of Connecticut mandate that an incarcerated pro se defendant have access to a law library where state financed legal assistance is available instead. Id., 653–57. Specifically, the court held that the provision of standby counsel afforded the

defendant an adequate link to the legal information necessary for self-representation. Id., 657.

The defendant filed his brief for this appeal prior to the court's decision in *Fernandez* and submitted a reply brief after the decision was released. He concedes that *Fernandez* controls and, therefore, his right to represent himself was not violated because he was denied access to a law library. The defendant still argues, nonetheless, that his standby counsel did not provide adequate access to legal materials in that counsel did not provide all of the materials that the defendant desired or give the defendant advice supported by thorough research.[20] We disagree.

The *Fernandez* court established a bright line rule articulated as follows: "[A] criminal defendant who knowingly and intelligently waives the right to counsel and who has been appointed standby counsel is not constitutionally entitled to access to a law library. Rather, the appointment of standby counsel satisfies the state's obligation to provide the defendant with access to the courts. . . . [T]he role of standby counsel is essentially to be present with the defendant in court and to supply the limited assistance provided for in Practice Book § 44-5,[21] the provision governing the func-

---

[20] The record reveals that the defendant's standby counsel provided him with, at least, copies of relevant statutes, some case law, the rules of practice, an evidence treatise, a sheet of common objections and some judicial college material. The defendant claims that was inadequate and urges specifically that, had he had access to Connecticut law on the IAD, "it is beyond a reasonable doubt that he might have prevailed on key procedural issues." He does not, however, point to any specific case that would have been determinative of any particular procedural issue. Indeed, he acknowledges in a separate portion of his brief that "[t]here are very few IAD decisions in Connecticut, and the question of overlapping state prosecutions and detainers appears to be one of national first impression." As discussed in part IV, the defendant's claims regarding the IAD are meritless.

[21] Practice Book § 44-5 provides: "If requested to do so by the defendant, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant.

tion of standby counsel. . . . [S]*tandby counsel does not, however, have any obligation to perform legal research for the defendant.*" (Emphasis added.) Id., 658.

The defendant asks that we ignore the plain language of that recently enunciated rule and hold that his standby counsel was required to perform legal research. That we cannot do. See *State* v. *Vas*, 44 Conn. App. 70, 78, 687 A.2d 1295, cert. denied, 240 Conn. 910, 689 A.2d 474 (1997). We hold that the defendant's state and federal constitutional rights to represent himself were not infringed under the circumstances of this case.

## IV

The defendant next claims, on a variety of theories, that the proceedings violated provisions of the IAD.[22] We disagree.

---

Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."

[22] General Statutes § 54-186 provides in relevant part: "The contracting states solemnly agree that:

"Article I

"The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. . . .

\* \* \*

"Article IV

"(a) The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in a party state made available in accordance with article V (a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request; and provided further that there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon

The following additional facts and procedural history are relevant to our discussion of this claim. The defendant was a sentenced federal prisoner as of April 4, 1996. On or about May 31, 1996, he was brought to Connecticut to face charges for offenses he allegedly committed in April and May, 1995. The record indicates that he was held in Rhode Island during his federal trial and was en route to a designated facility in Otisville, New York. On July 24, 1996, while being held at the New Haven Correctional Center, he committed the assaults for which he was convicted, which conviction he now appeals. As a result of those assaults, the defendant was transferred to Northern, a higher security facility, that same day. The defendant was arraigned on the assault charges on July 26, 1996. The state's attorney secured his presence in court that day by means of a writ of habeas corpus ad respondendum.

On August 15, 1996, the defendant filed a motion for a speedy trial pursuant to Practice Book §§ 43-39 and 43-40, in which he stated that he was in the custody of the Connecticut department of correction pursuant to a "habeas." His release to the federal authorities was

motion of the prisoner. . . .

"(c) In respect of any proceeding made possible by this article, *trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state,* but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. . . .

"(e) *If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment* pursuant to article V (e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

"Article V

* * *

"(d) The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints *which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction.* . . ." (Emphasis added.)

delayed so that motion could be addressed.[23] On August 23, 1996, the court, *McMahon, J.*, granted the defendant's speedy trial motion and, after determining that he was only temporarily in the custody of Connecticut, ordered that the state's attorney file an interstate detainer to secure the defendant's presence before the proceedings could continue. On August 27, 1996, the defendant was returned to federal custody and transported to the New York prison.

On September 3, 1996, the state's attorney sent the warden at Otisville, New York, a copy of the New Haven information containing the assault charges and asked that it be lodged against the defendant. The United States Department of Justice lodged the information as a detainer on September 11, 1996, and the defendant was returned to Connecticut on December 3, 1996. After the still pending proceedings in Bridgeport ended in a mistrial, the defendant was tried on the assault charges in New Haven. Voir dire for the New Haven trial commenced on January 15, 1997. The trial concluded on February 7, 1997. At the start of the New Haven proceedings, the defendant filed a motion to dismiss the charges on the ground that the trial violated provisions of the IAD, and argued that his May 31, 1996 presence in Connecticut had been secured pursuant to that statute and that the current proceedings were in violation of its provisions. The court denied his motion, finding the IAD provisions inapplicable.

"The IAD is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law. *Cuyler* v. *Adams*, 449 U.S. 433, 442, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981)." (Internal quotation marks omitted.) *Remick* v. *Lopes*, 203 Conn. 494, 498, 525 A.2d 502 (1987). "Our standard of review of the

---

[23] Apparently, the delay was achieved when the state's attorney requested a continuance.

[defendant's] claim is plenary. We must decide whether the court's conclusion is legally and logically correct and find[s] support in the facts that appear in the record." (Internal quotation marks omitted.) *Pinto* v. *Commissioner of Correction*, 62 Conn. App. 24, 30, 768 A.2d 456, cert. denied, 256 Conn. 906, 772 A.2d 596 (2001).

"The purpose of the IAD is to establish a cooperative procedure for disposition of charges against a prisoner in one state who is wanted to respond to untried criminal charges in another state. General Statutes § 54-186, art. I. The IAD is activated when the state seeking the prisoner (the receiving state) files written notice that he is wanted to answer charges in that state. [General Statutes § 54-186, art. IV.] This notice, referred to as a detainer, is simply a notification filed with the institution in which the prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction. *United States* v. *Mauro*, 436 U.S. 340, 359, 98 S. Ct. 1834, 56 L. Ed. 2d 329 (1978)." (Internal quotation marks omitted.) *State* v. *Smith*, 57 Conn. App. 478, 481–82, 749 A.2d 67 (2000).

The IAD is intended to expedite the disposition of untried charges against incarcerated defendants in support of programs of prisoner treatment and rehabilitation, and thus contains two speedy trial trigger mechanisms. *Narel* v. *Liburdi*, 185 Conn. 562, 567, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982). Once a detainer has been lodged by the receiving state, "the time clock can be activated by the detainee, under article III, or by the prosecuting authority in the [receiving] state, under article IV." Id. In this case, the parties agree that the applicable provision of the IAD is article IV (c), which requires trial on the untried charges to begin within "one hundred twenty days of the arrival of the prisoner in the receiving state" and to be completed before the prisoner is returned to the original place of incarceration. See

footnote 22. (The latter requirement is known as an "antishuttling" provision.) If the receiving state violates the time limits proscribed by the statute [or its antishuttling provisions], the pending charge or charges must be nullified and dismissed with prejudice, and the detainer invalidated. *Narel* v. *Liburdi*, supra, 569–70.

The defendant first argues that he was brought to Connecticut on May 31, 1996, pursuant to the IAD and, therefore, his return to the federal authorities and subsequent transfer back to Connecticut to face the assault charges violated the speedy trial and antishuttling provisions of article IV of the IAD. He claims that, once he was here initially, Connecticut was obligated to try all outstanding charges against him within 120 days and before returning him to federal custody, including those resulting from the July, 1996 assaults. We disagree.

First, we note that the record does not establish that the defendant was originally in Connecticut pursuant to the IAD. The record lacks copies of the documentation pursuant to which the defendant initially was transferred to the Connecticut authorities, and, otherwise, contains conflicting characterizations of the transfer.[24]

---

[24] The record in this case is not a model of clarity, but it appears to us that the defendant, after being sentenced in a Rhode Island federal court on or about April 4, 1996, was designated to serve his sentence at FCI-Otisville, a federal prison in New York. Prior to being transferred there, he was in temporary custody in Connecticut to face the charges against him in Enfield and Bridgeport and, during that time, committed the additional offenses at issue in this appeal. The defendant's speedy trial motion, the transcript of the hearing thereon and an August 22, 1996 letter to the state's attorneys from Lynn Milling, the Connecticut department of correction's interstate compact supervisor, indicate that the defendant's presence in Connecticut at that time was pursuant to a habeas rather than a detainer. Writs of habeas corpus ad prosequendum generally are held not to be detainers within the meaning of the IAD. *United States* v. *Mauro*, supra, 436 U.S. 361; see also annot., 98 A.L.R.3d 149 § 9[b] (1980), and cases discussed therein. Although the defendant in his motion to dismiss and, on appeal, in his "statement of the case" and argument asserts that his initial presence in Connecticut was "under the Interstate Agreement on Detainers," we are not directed toward, nor can we find, any documentary evidence in the record to support that assertion. The defendant points to the trial court's

It is the responsibility of the appellant to provide this court with an adequate record as to the issues raised for review. Practice Book § 61-10. "For purposes of this section, the term 'record' . . . includes all trial court decisions, *documents* and exhibits necessary and appropriate for appellate review of any claimed impropriety." (Emphasis added.) Id. Failure to do so will result in abandonment of the claim.

Even if we assume arguendo that the defendant initially was brought to Connecticut pursuant to a detainer and that the IAD provisions applied, there still would be no violation on the facts of this case. By the plain language of § 54-186, the statute's provisions apply only to trial on charges that form the *basis of the detainer*, that is, the reason for its being lodged. See footnote 22. Because the assaults and the charges therefor did not even occur until the defendant already was in Connecticut, they clearly were not the reason for, i.e., the basis of, the May 31, 1996 transfer.

The defendant claims that charges arising *after* a prisoner is brought to a state pursuant to a detainer also must be disposed of in compliance with the IAD, but cites no case law in support of that assertion. To the contrary, our review of the case law discloses that courts considering the issue, or analogous ones, have held that the IAD requirements apply only to the charges specifically contemplated by the detainer. See, e.g., *Hicks* v. *State*, 719 S.W.2d 86, 89–90 (Mo. App. 1986) (no violation of speedy trial provision for delayed robbery trial where detainer had been filed against defendant on some charges but not robbery charge);

articulation explaining why his sentence was imposed consecutively to his federal sentence. Therein, the court refers to his initial presence in Connecticut as being pursuant to the IAD. The court, however, did not state any basis for that finding or even characterize it as a finding. The court did not make that determination because it was not relevant to the matter it was addressing in the articulation.

*Commonwealth* v. *Boyd*, 451 Pa. Super. 404, 409–10, 679 A.2d 1284 (1996) (no violation of speedy trial provision where Pennsylvania tried defendant for new charges that were not basis of detainer to New Jersey authorities), appeal denied, 547 Pa. 723, 689 A.2d 230 (1997). We hold that, because the defendant was not in Connecticut's custody in July, 1996, pursuant to a detainer based on the assault charges, his transfer to federal custody in August, 1996, and subsequent return to Connecticut for trial on those charges in January, 1997, did not violate the speedy trial or antishuttling provisions of the IAD.

The defendant further argues that a July 24, 1996 "temporary surrender form" or, alternatively, the New Haven state's attorney's request that he remain in state custody after being released by the Bridgeport court operated as effective detainers, and he claims various violations of the IAD premised on those assertions. We decline to address those claims because the record is unclear as to the exact nature of those communications[25] and, further, because the defendant provides sparse legal analysis as to why they ought to be considered detainers. See Practice Book § 61-10; *State* v. *Miller*, 59 Conn. App. 406, 409–10, 757 A.2d 69 (2000), cert. denied, 255 Conn. 942, 769 A.2d 60 (2001).

---

[25] The "temporary surrender form" appears to have been filled out by state police and state correctional officials, not by any federal officials, and merely evidences the defendant's transfer between Northern and New Haven for arraignment. The temporary surrender for purposes of the July 26, 1996 arraignment is authorized by a letter from the United States Marshal's office in New Haven. The mechanism by which the surrender was requested is not apparent. There is no indication that any of those communications were written "notification[s] filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction"; (internal quotation marks omitted) *United States* v. *Mauro*, supra, 436 U.S. 359 (citing H.R. Rep. No. 91-1018, p. 2 (1970), and S. Rep. No. 91-1356, p. 2 (1970), the legislative history of the federal enactment of the IAD, for a definition of "detainer"); especially given the fact that the defendant had not yet been transferred to the federal prison in Otisville, New York.

Last, the defendant claims that even if we find the September 11, 1996 formal detainer to be the only operative one as to the assault charges, there still was a violation of the IAD because he was not brought to trial until 126 days after the filing of that detainer. That claim is without merit.

The defendant does not contest the validity of the September 11, 1996 detainer. As previously discussed, we reject his claims that any earlier communications between state and federal officials constituted detainers and, thus, accept that only the September 11, 1996 detainer was operative for purposes of the IAD and the assault charges against the defendant. The defendant argues that his trial commenced 126 days after the filing of the detainer and after a continuance was granted in his absence, contrary to the IAD. In so claiming, the defendant ignores the plain language of the statute, which requires that "trial shall be commenced within one hundred twenty days *of the arrival of the prisoner in the receiving state*"; (emphasis added) General Statutes § 54-186, art. IV (c); *not* within 120 days of the lodging of the detainer. The defendant arrived in Connecticut on December 3, 1996. His trial commenced in mid-January, 1997, well within the IAD speedy trial deadline, and was concluded by mid-February, 1997.

Accordingly, we hold that the defendant's trial proceedings did not violate the IAD.

V

Finally, the defendant claims that the court improperly interpreted § 53a-167c (b) as requiring the imposition of a sentence consecutive to the one he already was serving in federal prison. He argues that the statute mandates consecutive sentencing only if the convicted prisoner is serving a sentence in a Connecticut prison at the time of the assault. We are not persuaded.

At his sentencing hearing, the defendant asked the court to impose his sentence concurrently to the federal one that he already was serving. The court imposed a consecutive sentence. In its July 7, 1998 articulation, the court reiterated its belief that, pursuant to § 53a-167c (b), it lacked discretion to impose a concurrent sentence.

Section 53a-167c (b) provides in relevant part: "Assault of a[n] . . . employee of the department of correction . . . is a class C felony. If any person who is confined in an institution or facility of the department of correction is sentenced to a term of imprisonment for assault of an employee of the department of correction under this section, such term shall run consecutively to the term for which the person was serving at the time of the assault."

Whether § 53a-167c (b) requires a consecutive rather than concurrent sentence in the current circumstances is a question of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Kelly* v. *Bridgeport*, 61 Conn. App. 9, 13–14, 762 A.2d 480 (2000), cert. denied, 255 Conn. 933, 767 A.2d 104 (2001).

"It is axiomatic that penal statutes . . . are to be strictly construed to protect the fundamental constitutional right to liberty. . . . Equally fundamental, however, is the principle of statutory construction that statutes are to be construed so that they carry out the

intent of the legislature." (Internal quotation marks omitted.) *State* v. *Woolcock*, 201 Conn. 605, 630, 518 A.2d 1377 (1986). "[T]he application of common sense to the language of a penal law is not to be excluded in a way which would involve absurdity or frustrate the evident design of the lawgiver." (Internal quotation marks omitted.) Id., 630–31.

"The purpose of § 53a-167c (a) is to prevent and punish injurious behavior intended to interfere with public servants' performing their duties." *State* v. *Dunbar*, 37 Conn. App. 338, 347, 656 A.2d 672, cert. denied, 233 Conn. 906, 657 A.2d 644 (1995). "The statute is intended to protect peace officers in the performance of their duty." *State* v. *Woolcock*, supra, 201 Conn. 631. It is common sense that the mechanism of mandatory consecutive sentencing for assaults of correction officers is meant to deter such assaults by disallowing what would essentially amount to a free ride for such an offense, i.e., a prisoner who received a concurrent sentence for an assault of a correction officer would be no worse off for having committed the crime.

The defendant was confined in the New Haven Correctional Center, a "facility of the department of correction," and committed assaults upon "employee[s] of the department of correction . . . acting in the performance of [their] duties." His actions, therefore, were precisely those that § 53a-167c was intended to deter. The defendant's argument implies that the legislature did not intend to deter federal prisoners from assaulting Connecticut correction employees, only state prisoners. That construction defies common sense. We find that the legislature intended to deter *all* prisoners being held in Connecticut facilities, whether there temporarily or for the duration of a sentence, from assaulting employees of those facilities. The court, therefore, correctly determined that it lacked discretion to impose the

defendant's sentence concurrently to his federal sentence.

The judgment is affirmed.

In this opinion the other judges concurred.