STATE OF CONNECTICUT *v.* JOAO Q. NUNES
(SC 16513)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued February 15—officially released July 2, 2002

*Margaret Gaffney Radionovas*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *David Zagaja*, assistant state's attorney, for the appellant (state).

*Alinor C. Sterling*, special public defender, with whom, on the brief, was *Ira B. Grudberg*, special public defender, for the appellee (defendant).

*Opinion*

BORDEN, J. The state appeals, following our grant of certification, from the judgment of the Appellate Court reversing the defendant's conviction on charges of assault in the second degree and illegal distribution of a controlled substance. The state claims that the Appellate Court improperly concluded that the evidence was insufficient to establish beyond a reasonable doubt that the victim[1] was administered particular drugs, namely, temazepam, chloral hydrate or a combination of the two. We reverse the judgment of the Appellate Court and remand the case to that court with direction to affirm the judgment of the trial court.

The defendant, Joao Q. Nunes, was convicted, after a jury trial, of one count of assault in the second degree in violation of General Statutes § 53a-60 (a),[2] one count

---

[1] Pursuant to General Statutes § 54-86e, we do not refer to the victim by name in this opinion in order to protect the victim's privacy interests.

[2] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (4) for a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to such person, without his consent, a drug, substance or preparation capable of producing the same . . . ."

of illegal possession of a controlled substance in violation of General Statutes § 21a-279 (c),[3] and one count of illegal distribution of a controlled substance in violation of General Statutes § 21a-277 (b).[4] The defendant appealed from the judgment of the trial court to the Appellate Court contending, inter alia, that the evidence on the assault and illegal distribution charges was insufficient to establish beyond a reasonable doubt that the victim actually had ingested temazepam, chloral hydrate or a combination of the two.[5] The Appellate

[3] General Statutes § 21a-279 (c) provides: "Any person who possesses or has under his control any quantity of any controlled substance other than a narcotic substance, or a hallucinogenic substance other than marijuana or who possesses or has under his control less than four ounces of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and for a subsequent offense, may be fined not more than three thousand dollars or be imprisoned not more than five years, or be both fined and imprisoned."

[4] General Statutes § 21a-277 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marijuana, except as authorized in this chapter, may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

The jury returned a verdict of not guilty on one count of sexual assault in the third degree in violation of General Statutes § 53a-72 (a) (1) (A), and one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (2).

[5] On appeal to the Appellate Court, the defendant also claimed that the trial court improperly had admitted certain testimony regarding alleged prior misconduct committed by the defendant. The Appellate Court only addressed this claim with respect to the illegal possession charge. In affirming the defendant's conviction on that charge, the Appellate Court concluded that the prior misconduct evidence was admitted only as to the assault and illegal distribution charges, and therefore could not properly be considered as a claim of error on the illegal possession charge. *State* v. *Nunes*, 61 Conn. App. 668, 682–83, 767 A.2d 181 (2001). In light of the Appellate Court's conclusion that there was insufficient evidence to support the defendant's convictions on the assault and illegal distribution charges,

Court reversed the defendant's conviction on the assault and illegal distribution charges, and remanded the case to the trial court with direction to render a judgment of acquittal on those charges. *State* v. *Nunes*, 61 Conn. App. 668, 683, 767 A.2d 181 (2001). This certified appeal followed.[6]

The underlying facts, as set forth by the Appellate Court, are as follows. "Between May and September, 1993, the victim[7] worked as a computer graphics artist with an East Hartford graphics firm. The firm had a contract with the Hartford police department to prepare a slide presentation about community policing. The defendant, a Hartford police officer since November 26, 1979, worked with the victim between May and August, 1993.

"On or about September 7, 1993, after they had completed the project, the defendant telephoned the victim and asked if she would be interested in going out on a surveillance operation that involved the use of a new infrared camera that the police department had acquired. After some convincing by the defendant, she agreed to meet him that evening.

"At approximately 7 p.m. on September 7, 1993, the victim went to the defendant's office in the police department, at which time he began describing the department's new printer and computer. He wanted to

---

it did not address the issue of whether the prior misconduct evidence was improperly admitted on those charges. Because we reverse the Appellate Court's conclusion that the evidence was insufficient to support a conviction on those charges, in part II of this opinion we address the defendant's claim of evidentiary admissibility on the assault and illegal distribution charges.

[6] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the evidence was insufficient to sustain the conviction of the defendant on the first count, namely, assault in the second degree, and the third count, namely, distribution of a controlled substance?" *State* v. *Nunes*, 256 Conn. 901, 772 A.2d 598 (2001).

[7] The victim was a nineteen year old female college student.

show her how the printer worked and printed a picture. When it printed a picture of a woman who 'was either naked or wearing a skimpy bathing suit,' the victim became embarrassed and told him that she did not want to see the picture.[8] After showing her the picture, he asked if she wanted something to drink. She initially declined, but then agreed to have some already prepared iced tea, which he took out of a small refrigerator in his office. She drank it within a few minutes. Immediately after he gave her the iced tea, the defendant left the room to get a bulletproof vest for the victim to wear because they were going out on surveillance. The defendant then returned with the vest and told her to put it on. About three to five minutes after drinking the iced tea, the victim began feeling 'foggy,' 'sluggish' and 'really dizzy.'

"The defendant and the victim then walked through a hallway to a classroom that contained gym mats. The defendant turned the lights off and started to show the victim how the infrared camera worked. She sat on a chair and, when he turned the lights on, he noticed that the victim looked pale. He suggested that she lie down on a mat. The defendant said that he had to speak to someone, and turned off the lights and left the classroom.

"The next thing that the victim remembered was that she was lying on the mat, 'fading in and out,' 'feeling very dizzy, foggy,' and that 'she knew something wasn't right.' As she awoke, the defendant was at her right side. She no longer was wearing the bulletproof vest. The defendant then asked if he could kiss her and, although she refused, he kissed her anyway.

---

[8] The victim testified that this picture was from the defendant's computer. James Donnelly, a former police captain, testified that, upon examining the defendant's computer, he discovered a file named "bree mk4.gif." The file contained two pictures of blond females naked from the waist up. The victim, who is blond, has the nickname "Bree."

"Next, the victim sat up and said that she wanted to go home. The defendant suggested, and the victim agreed, that he should drive her home because she was in no condition to drive herself. On the way to the victim's house, they stopped once to get soda. They stopped again because the victim felt sick and she vomited.

"After she arrived home, the victim slept through the night until about 5:30 a.m., at which time her head had cleared and her stomach problem had disappeared. She then called her boyfriend and asked him to come to her home. When he arrived, he observed her 'crying hysterically.' She told him that she thought she had been drugged and sexually assaulted the night before. He took her to the East Hartford police department, but she refused to go inside, so they returned to her home. There, the victim told her mother what she believed had happened. Her mother suggested that she go to a hospital to find out what she had ingested. After contemplating her mother's advice, she went to the hospital that afternoon. While there, she told the hospital staff that she thought she had been drugged and sexually assaulted, but denied that a rape had occurred.[9]

"At the hospital, tests were performed on the victim's blood and urine. No alcohol was detected. Tests also were performed to determine whether she had ingested certain types of drugs; those tests were negative. Most notably, the tests were negative for benzodiazepines, which include temazepam, one of the drugs the state charged the defendant with putting in the victim's iced tea. The other drug the state charged the defendant with putting in the victim's drink was chloral hydrate. The hospital did not test for that drug. Temazepam and chloral hydrate are controlled substances.

---

[9] "The victim refused to have a pelvic and rape examination." *State* v. *Nunes,* supra, 61 Conn. App. 673 n.10.

"Upon returning home from the hospital on September 8, 1993, the victim noticed that the defendant had telephoned her. She then telephoned him. When they spoke, she asked the defendant what he had put in her drink. She testified that his response was, 'All kinds of good stuff.' She then told him that she knew something had happened and that he was not going to get away with it. She also informed the defendant that she was going to proceed further. That was her last contact with the defendant.

"On September 10, 1993, she reported the incident to the East Hartford police, and met with Lieutenant Timothy Hogan and Sergeant Antonio Cancel of the Hartford police department. She gave them a tape-recorded statement that later was reduced to a written statement, which she signed. On September 14, 1993, Cancel and Sergeant Robert O'Connell of the Hartford police department informed the defendant that he was the subject of a criminal investigation generated by a complainant who claimed that she was drugged and sexually assaulted on September 7, 1993. Those officers then took a written statement from the defendant.

"On September 14 and 15, 1993, the police officers seized certain materials from the defendant's office in the Hartford police department. Those materials included: Two glasses, one found on a windowsill and one on a refrigerator; some iced tea mixture (brownish powder); a bulletproof vest; a bottle of chloral hydrate, which was found behind some files in the top drawer of a locked file cabinet; a Tylenol bottle containing some yellow capsules; a Nuprin bottle containing white pills, which was locked in a portion of the defendant's desk; and an eight millimeter radio cassette tape found inside a Canon video camcorder.

"Upon testing, the state forensic laboratory detected no narcotics or controlled drugs on the two glasses, in

the Tylenol bottle or in the brownish powder. The Nuprin bottle, however, contained a number of clear capsules that, according to the forensics tests, contained temazepam. Further, tests that were performed on the bottle labeled 'chloral hydrate,' disclosed that it did, in fact, contain chloral hydrate." *State* v. *Nunes*, supra, 61 Conn. App. 670–74. Additional facts will be set forth as necessary.

## I

The state claims that the Appellate Court improperly concluded that there was insufficient evidence to sustain the defendant's conviction on the assault and illegal distribution charges because, in the Appellate Court's view, there was insufficient evidence that the defendant administered chloral hydrate, or temazepam, or both, to the victim. Specifically, the state contends that there was sufficient evidence from which a jury reasonably could have concluded that the defendant administered chloral hydrate, or temazepam, or a combination thereof, to the victim. We agree that the evidence was sufficient for the jury reasonably to conclude that the defendant administered chloral hydrate to the victim.[10]

## A

Before reaching the merits of this issue, we briefly address the state's claim that, with respect to the assault

---

[10] In its instructions to the jury regarding the essential elements of the crime of assault in the second degree, the trial court stated: "For you to find the defendant guilty of this charge the state must prove . . . that the drug, substance or preparation was temazepam or chloral hydrate or both. While the charge is written in what we call the conjunctive in that it uses an 'and,' the state only has to prove one or the other of the substances or if you believe unanimously that a combination of both." The trial court gave the same instruction as to the illegal distribution charge. Neither party claims that this instruction was erroneous. Because we conclude that there was sufficient evidence for a jury to find that the defendant administered chloral hydrate to the victim, we need not address whether the state also proved the assault and illegal distribution charges as to temazepam or a combination of the two.

charge, it was required to prove only that the defendant administered, without the consent of the victim, "a drug, substance or preparation capable of producing [stupor, unconsciousness or other physical impairment or injury]"; General Statutes § 53a-60 (a) (4); not that the drug administered was chloral hydrate or temazepam.[11] Because the state has not properly preserved this claim for appeal, we decline to review it.

We have previously stated: "[B]ecause our review is limited to matters in the record, we will not address issues not decided by the trial court. Practice Book § 4185, [now § 60-5] (court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims neither addressed nor decided by court below are not properly before appellate tribunal); *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982) ([o]nly in the most exceptional circumstances will this court consider even a constitutional claim not properly raised and decided in the trial court). *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998)." (Internal quotation marks omitted.) *Rivera* v. *Double A Transportation, Inc.*, 248 Conn. 21, 33, 727 A.2d 204 (1999). Furthermore, on a certified appeal, our focus is on the judgment of the Appellate Court; *Burton* v. *Browd*, 258 Conn. 566, 570, 783 A.2d 457 (2001); and we ordinarily do not review claims not raised therein. *State* v. *Torrence*, 196 Conn. 430, 433, 493 A.2d 865 (1985).

In this case, the assault count of the information charged that "the defendant intentionally caused stupor, unconsciousness and other physical impairments

---

[11] The state does concede that, with respect to the illegal distribution charge, it was required to prove that the defendant administered chloral hydrate, temazepam or a combination of the two.

and injury to another person by administering to that person, without her consent a controlled substance, *specifically [c]hloral [h]ydrate and [t]emazepam.*" (Emphasis added.) On this count, the court charged the jury: "For you to find the defendant guilty of this charge the state must prove the following elements beyond a reasonable doubt: That the defendant administered a drug, substance or preparation capable of producing stupor or unconsciousness or physical impairment to another person. Here, because of the way the charge is written, the state *must prove that the drug,* substance or preparation *was temazepam or chloral hydrate or both.*" (Emphasis added.) The state did not except to this charge, and did not claim in the Appellate Court that it was not required to prove that the drug administered was chloral hydrate. We therefore decline to review this claim of the state.

## B

We turn now to the state's claim that there was sufficient evidence for a jury to find beyond a reasonable doubt that the defendant administered chloral hydrate to the victim. "In reviewing a sufficiency of the evidence claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that

it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000).

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts. . . . Moreover, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citation omitted; internal

quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 518–19, 782 A.2d 658 (2001).

On the facts of this case, we conclude that a jury reasonably could have found that the defendant administered chloral hydrate to the victim on September 7, 1993. We base this conclusion on: (1) the evidence of the defendant's possession of chloral hydrate shortly after the incident took place; (2) the victim's testimony as to her condition before, during and after the incident; (3) the evidence supporting a motive of the defendant, namely, to engage in sexual touching of the victim; (4) the evidence of the defendant's admission that he had put something unusual into her drink, namely, " '[a]ll kinds of good stuff' "; (5) the testimony of the expert witnesses concerning the effects of chloral hydrate; (6) the evidence of consistency between the effects of chloral hydrate and the victim's symptoms; and (7) the evidence of the infrequent use of and difficulty of obtaining chloral hydrate.

Viewed in a light most favorable to the state, the jury could have found the following facts. It was undisputed that the defendant was in possession of chloral hydrate on September 14 and 15, 1993. In addition, there was the following evidence. The defendant telephoned the victim on September 2 or 3, 1993, and invited her to go out with him on a police surveillance operation, where they would test out an infrared camera that the Hartford police department had just obtained. The victim, who was majoring in criminal justice studies at the time, expressed interest at this opportunity. The victim arrived at the Hartford police department on September 7, 1993, shortly after 7 p.m. She had eaten pizza for dinner and arrived at the police station feeling "fine"; she was not feeling dizzy or light-headed, had not consumed any alcohol or drugs that day, and was not suffering from a head cold or an inner ear infection. The victim, however, had been experiencing stomach prob-

lems prior to September 7, 1993, which resulted in nausea and cramping, but no vomiting.

After entering the police station, the victim met the defendant in the lobby and then they both proceeded to the defendant's office. Shortly after arriving at the defendant's office, the defendant, without being prompted, offered the victim a glass of ice tea, which she accepted. The defendant then removed a glass mug from a small refrigerator and gave it to the victim. The mug was full of a liquid that resembled ice tea, which the defendant had prepared before the victim's arrival. The victim started drinking the ice tea, which, she stated, "tasted like regular ice tea"; it did not have a different odor or any bitter taste. Shortly after beginning to drink the ice tea, approximately five minutes by the victim's recollection, she began feeling dizzy. The victim described the sensation as feeling "very foggy, very— like fading in and out. Almost like you were drunk, just real sluggish like."

While the victim was drinking the ice tea, the defendant left his office, returning after several minutes with a bulletproof vest for the victim to wear for her protection while on the surveillance operation. When the victim told the defendant that she was feeling dizzy and suggested that they go on the surveillance another time, the defendant told the victim that her dizziness was probably the result of fumes from a new laser printer that he had in his office. The victim, upon being informed that the vest was worn underneath her shirt, asked for directions to the ladies room. After being told by the defendant to "do it here," she put on the vest under her shirt without taking her shirt off, while in the presence of the defendant. The defendant also suggested to the victim that she remove her brassiere because the vest would make it uncomfortable for her to wear the brassiere. The victim kept on her brassiere.

As the victim was attempting to put on the vest, the defendant began to "[play] around with" the department's new infrared camera. The defendant stated he was "dying to try it out," and make sure that it was working properly. The defendant explained to the victim that the camera could detect variations in skin pigmentation, and asked the victim to lift up the back of her shirt in order to see if any tan lines were visible on the camera. The victim recalled her shirt being lifted up, but could not remember whether she lifted it or if the defendant did so. After videotaping the victim, the defendant rewound the tape and played it for her.

Approximately one-half hour after arriving at the police station, the defendant brought the victim to a classroom so he could demonstrate the infrared camera in the darkness of the room. The victim, still feeling disoriented, sat down at a desk while the defendant turned off the lights and proceeded to videotape her.[12] After the defendant completed videotaping the victim, he turned on the lights and, noticing that the victim looked pale, advised her to lie down on one of the gym mats lying on the floor toward the front of the classroom. The victim lied down on her back and started " 'fading in and out.' " The next thing the victim recalled was waking up with the defendant by her right side, with her shirt undone, her brassiere up to her neck, her breasts exposed, the buttons on her jeans undone and the bulletproof vest removed. The victim did not know how the bulletproof vest had been removed. The defendant asked the victim if he could kiss her. Despite the victim's negative response, the defendant proceeded to kiss her on the lips and on her right breast before putting his right hand down her pants. During this entire time, the victim described her condition as "[v]ery dizzy, foggy, fading in and out," and added, "[i]t was like I was paralyzed. Like my mouth

---

[12] A copy of this videotape, state's exhibit four, was shown to the jury.

couldn't move." As the victim began feeling more coherent, she told the defendant she wanted to go home. Because in her condition she was unable to drive, the defendant drove her home in his vehicle. Rather than drive the victim directly home, however, the defendant first took her to a McDonald's Restaurant, where he bought her a Coke, and then to Brainard Airport. After leaving the airport, the defendant again stopped his car, this time to allow the victim to get out and vomit. The victim finally arrived at her parent's house, where she lived, at approximately 10 p.m., and immediately went to bed.

The victim woke up the next morning sometime between 5 a.m. and 5:30 a.m. without any of the symptoms she had experienced the night before, including dizziness and light-headedness. The victim relayed the events of the previous evening to her mother and boyfriend, who eventually convinced her to see a physician. The victim went to Manchester Memorial Hospital, where she told the attending physician that she was at a party and thought someone may have slipped something into her drink. She denied being sexually assaulted and declined a pelvic exam, although she did consent to blood and urine tests. These samples were taken at approximately 11 a.m. on September 8, 1993. After returning home from the hospital, the victim called the defendant at the police department and asked him what he had put in her drink the previous evening, to which the defendant responded, " '[a]ll kinds of good stuff.' " That was the last contact the victim had with the defendant.

In order to explain the effects of chloral hydrate and compare the victim's symptoms to those caused by the drug, the state first called Joel R. Milzoff, a forensic toxicologist, who was the health laboratory section manager of toxicology at the state department of public health. Milzoff described chloral hydrate, a Schedule

IV controlled substance, as a "liquid drug that acts as a sedative or hypnotic, a central nervous system depressant," and stated that one would need a prescription to obtain the drug. Milzoff explained that chloral hydrate has a "sweet distinctive odor smell," and normally a "very bitter taste." Milzoff further testified that, in his opinion as a toxicologist, chloral hydrate would change the taste of tea if it were added to it. There was evidence that the chloral hydrate found in the defendant's possession had been placed in an orange-flavored solution by the manufacturer in order to hide the bitter taste of the chloral hydrate. Milzoff testified that the stronger the concentration of the ice tea, the more likely that the flavor of the chloral hydrate would be masked.

As for the symptoms caused by the ingestion of chloral hydrate, Milzoff testified that the likely effect would be to make someone drowsy and "possibly" light-headed.[13] He also testified that it was "feasible" that chloral hydrate could cause dizziness, but that he had never heard of it making people dizzy.[14] Milzoff also

[13] Milzoff later clarified what he meant by being "light-headed." When asked if chloral hydrate would make someone light-headed, Milzoff responded: "Possibly. Again, it's a sedative. I'm not quite sure what you mean by light-headed but when you feel groggy—it's not—it doesn't stimulate you. It depresses you. So if you interpret being groggy and not functioning well as light-headed, it doesn't stimulate you. That's another way to say light-headed when they are high from drugs. It's not that type of thing at all."

[14] In response to questioning by the defendant's attorney, Milzoff testified as follows:

"Q. [Chloral hydrate] wouldn't make you dizzy, typically?

"A. No. But if you move quickly, again, if you have a sedative you're very groggy. It effects your central nervous system. That's a possibility. I don't know that it would do that but it certainly is feasible.

"Q. You've not heard of that as far as your knowledge and research as of now?

"A. I don't recall that.

"Q. It's possible but you've never heard of it in your twenty-five years?

"A. It basically [is] because since it is a central nervous system drug and it affects things that are controlled by the central nervous system, you're ability to reflex, nervous conduction could be affected. So it, indeed, is feasible. I haven't heard that particularly with the drug. I don't know that it doesn't. I don't know that it does.

testified that chloral hydrate is a "reasonably rapid acting drug" that would take effect within the hour, but that it would not take effect instantaneously or within five minutes. Lastly, Milzoff stated that, because chloral hydrate is an irritant, taken in a sufficient dose it could cause one to vomit. All of these potential effects would vary in intensity depending on the amount ingested, the contents of the stomach when ingested, and the size of the person ingesting chloral hydrate; the lighter the person, the more powerful the effects.[15] According to Milzoff, the time before the onset of symptoms would not vary by weight, however, because it takes a certain amount of time for the body to process the chloral hydrate.

The state also called James O'Brien, a physician and clinical pharmacologist. As a former director of the alcohol and drug treatment center and poison control center at the University of Connecticut Health Center, O'Brien had extensive experience in the treatment of individuals under the influence of controlled drugs. O'Brien testified that he was familiar with the effects of chloral hydrate, having dispensed it as a pharmacist over many years. He described the drug as one of the oldest hypnotics prescribed, being used as early as the 1800s. According to O'Brien, up until the 1960s, chloral hydrate was "extremely popular." He testified that today, however, "[i]t's not commonly prescribed. It's still prescribed but not very commonly." O'Brien then reiterated and expanded upon the comments of Milzoff.

---

"Q. But you never heard in your own experience—

"A. I don't recall it.

"Q. In your whole experience as a toxicologist, you never heard that it makes people dizzy.

"A. I don't recall that.

"Q. You don't recall ever hearing in your twenty-five odd years?

"A. Correct."

[15] The state represented to the court that the victim was four feet, ten inches tall and weighed approximately 100 pounds.

He stated that, after taking chloral hydrate "you'd become drowsy rather rapidly. You'd become drowsy and start to drift off into sleep." As for dizziness, O'Brien postulated that "[i]t would be more likely that you would be simply drowsy not describe it as dizzy unless, depending on the dose, if you increase the dose then you're going to become dizzy and weak and you'll have other effects . . . ." These other effects, depending on the dosage, could include nausea and vomiting. Although given a sufficient dose a person is likely to fall asleep, with enough stimulation it would be possible to arouse that person. Additionally, chloral hydrate can affect one's ability to concentrate and perceive the passage of time. As to the inception of symptoms, O'Brien testified that the onset of drowsiness would take place within fifteen to twenty minutes, with the person "pretty much asleep in a half an hour." O'Brien agreed with Milzoff that it would be unlikely that a person would feel the effects of chloral hydrate within five minutes. O'Brien also testified that, after a period of sleep, there should not be any lingering effects. Upon being asked if chloral hydrate could aggravate a preexisting stomach problem, O'Brien responded: "It certainly would." He then continued: "The drug is very irritating. It could irritate the lining of the stomach or the esophagus, meaning heartburn, gastritis, or the small intestine or the bowel or enteritis because of its caustic nature. If you had an underlying defect or ulcer or gastritis or heartburn or normally reflux, regurge that you see on television, then you had a much more pronounced effect because you already have a raw area." O'Brien later added: "There's a significant number of people who get nausea and vomiting. Not everybody. If everybody was getting that, it wouldn't last on the market."

A final area in which O'Brien answered numerous questions, the majority of them on cross-examination, concerned the taste and smell of chloral hydrate.

O'Brien, after smelling the exhibit containing the chloral hydrate, described it as having "a mild orange odor." On cross-examination, O'Brien defended his characterization of the chloral hydrate as mild and asserted that it was possible that a person would not be able to detect its presence in a drink like ice tea.[16]

On the basis of the previous testimony, the jury reasonably could have found the following facts and drawn the following inferences. First, the defendant administered some substance to the victim causing the symptoms suffered by her. The victim testified that she was feeling "fine" prior to arriving at the Hartford police

---

[16] Concerning the mixing of chloral hydrate into another substance, O'Brien testified as follows in response to questioning by the defendant's attorney:

"Q. Now, you indicate that the chloral hydrate—I forget exactly how you put it—it's a very, very irritating drug; is that right?

"A. That's correct. In and of itself.

"Q. And when you talk about masking it, what do you mean by masking it, so it's not irritating when you take it?

"A. No. I'm talking about the lousy taste. . . .

"Q. I take it the harsher the taste the more you have to mix it with something that is very strong to mask it; isn't that right?

"A. Well, I don't know if you would call it strong but at least effective and orange syrup is pretty good.

"Q. Okay. You indicated that you talked about a compound that was very sweet and with an orange taste. Right?

"A. That's correct.

"Q. I take it that in masking the terrible taste of the chloral hydrate what you're doing is creating another very distinctive taste; isn't that right?

"A. I don't know it's distinctive. It sure tastes like an orange flavor, like a sweet drink, sure.

"Q. Well, I take it if you're drinking something not expecting it to be sweet and it would mix with this sweet orange mixture that would be readily noticeable, wouldn't it?

"A. Yeah. If you took a teaspoonful out of the bottle, you'd notice it was orange flavored, sure. But that's a teaspoonful directly from the bottle.

"Q. Are you saying that if you put it into a glass of liquid, you wouldn't notice the orange flavor?

"A. You might notice it. But how big is the liquid? If you had a lot of liquid, if you had several ounces of liquid and you are putting a teaspoonful in, it may not be that noticeable."

station. Shortly after being given a drink of ice tea that had been in the exclusive possession of the defendant, however, the victim began feeling "dizzy," "foggy" and began "fading in and out." The defendant admitted having put something unusual in the ice tea. From these facts, the jury reasonably could draw the inference that the defendant put some unusual substance in the ice tea that brought about the victim's symptoms.

Second, the jury reasonably could have found, from the evidence of the nature of the pictures shown to the victim, the videotaping of the victim, the manner in which the defendant had the victim put on the vest, and from the evidence of the sexual touching, that the defendant had a motive to drug the victim into a condition in which she physically could not resist. That motive was to engage in some form of sexual touching of the victim.

Third, the jury could have found that the effects felt by the victim were consistent with those effects that one would expect after ingesting chloral hydrate. The symptoms experienced by the victim and described by the state's expert witnesses were nearly identical. The victim testified to experiencing dizziness, fogginess and drowsiness very shortly after drinking the ice tea. Both Milzoff and O'Brien testified that chloral hydrate would make one feel drowsy and stated that both dizziness and light-headedness were possible side effects. The victim estimated that she fell asleep approximately thirty minutes after ingesting the drink. Milzoff termed chloral hydrate a "reasonably rapid acting drug," and that one would feel its effects within the hour. O'Brien was more specific, stating that a person likely would be asleep within one-half hour after ingestion. The victim testified that she recalled certain events such as the defendant kissing her, but did not recall other events, such as how her bulletproof vest was removed. This selective memory was consistent with O'Brien's testi-

mony that a person under the influence of chloral hydrate likely would recall some events, but not all; the recall would be "cloudy." The victim, who had a preexisting stomach condition, stated that she vomited several hours after drinking the ice tea. O'Brien found this symptom plausible, due to the irritating nature of chloral hydrate. The victim testified that she woke up the next morning sometime after 5 a.m. experiencing none of the symptoms of the night before. O'Brien stated that chloral hydrate is considered to be a good hypnotic precisely because it does not result in a "hangover." Although the victim could not relate the precise time when the effects of the "ice tea" wore off, she testified that she had gone to bed around 10 p.m., less than three hours after ingesting the drink, and had awoken around 5 a.m. the next morning, almost ten hours after having had the drink. This evidence fits well within the half-life of chloral hydrate, which O'Brien testified is four to six hours.[17]

---

[17] O'Brien testified that "the half-life or the time it remains in the system, about four hours, four to six hours, and that correlates pretty much with the amount of time you would be asleep. So we're saying four to six hours somewhere in there."

O'Brien's testimony that chloral hydrate's half-life is four to six hours is seemingly contradicted by Milzoff, who testified that the half life of chloral hydrate is seven to ten hours. On cross-examination of O'Brien, the defendant's attorney drew O'Brien's attention to this apparent inconsistency.

"Q. Now, you indicated that you said the half-life of chloral hydrate is four to seven hours?

"A. Four to six.

"Q. Isn't it seven to ten, sir?

"A. Not the clinical pharmacological half-life, no. Not the clinical half-life. If you're measuring blood levels half-life, that's correct. If you measure the CNS effects in animals in the cerebral spinal fluid at the site, pharmacologically it's four to six.

"Q. But did you testify—I think you said, that one would expect if someone did fall asleep, they would stay asleep for what you said is the clinical half-life of four to six hours; isn't that true?

"A. That's right. They may sleep longer and coast into their own sleep but I would expect the effects of the chloral hydrate, four to six."

Although several symptoms described by the victim at first blush may have seemed inconsistent with the administration of chloral hydrate, O'Brien's testimony provided the jurors with sufficient information to resolve these inconsistencies. First, the victim testified that she began feeling the effects of the drink within three to five minutes. Although both Milzoff and O'Brien testified that such a prompt reaction was inconsistent with chloral hydrate, O'Brien stated that feeling effects within five minutes of taking a drug "would be inconsistent with almost anything you took . . . ." Furthermore, O'Brien testified that chloral hydrate can impair a person's sense of the passage of time. From this testimony, a jury reasonably could have inferred that the victim's estimate of three to five minutes for the onset of symptoms was inaccurate and that it took longer for her to feel the effects.

Another apparent inconsistency stems from the victim's description of the drink she ingested. She stated that the ice tea she drank did not taste or smell any different than any other ice tea she had consumed. Milzoff testified that the chloral hydrate preparation had "a sweet orangey aroma" but "not extremely strong." O'Brien stated that, depending on the dosage given and the volume of liquid to which the chloral hydrate was added, a person might not be able to detect the presence of chloral hydrate. From this testimony, a jury reasonably could have inferred that the victim did not detect the presence of chloral hydrate in her drink because it had been sufficiently diluted. Thus, given the fact that the symptoms described by the victim were consistent with those described by O'Brien as typical or possible with chloral hydrate, and that any discrepancies could be readily explained, a jury reasonably could have found that the unusual substance that the defendant had put into the ice tea was chloral hydrate.

A fourth finding the jury could have made, based on the testimony of Milzoff and O'Brien, was that chloral hydrate is an uncommonly prescribed drug. The jury also could have credited the testimony of Sergeants Cancel and O'Connell, who claimed that the bottle of chloral hydrate at issue was found in the defendant's office in a locked filing cabinet one week after the alleged incident. Given this cumulative testimony, the jury reasonably could have inferred that the defendant was in possession of chloral hydrate, a drug that was difficult to obtain, at the time that the incident took place.

The defendant contends that, because chloral hydrate was not tested for, and because there were "significant inconsistencies" between the victim's symptoms and the physicians' testimony regarding the effects of chloral hydrate, expert medical testimony was required, not only to match the victim's symptoms with the effects of chloral hydrate, but also to establish to a reasonable medical certainty that the victim's symptoms had been caused by chloral hydrate. We disagree.

The term "reasonable medical certainty" is another name for the reasonable medical probability standard. We have stated that: "Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." (Citations omitted.) *Struckman* v. *Burns*, 205 Conn. 542, 554–55, 534 A.2d 888 (1987). We do not require that certain "magic words" be used, and therefore, "[w]e reject the proposition that certain formulaic

words are essential when an expert renders an opinion.
. . . 'A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.' *Towne* v. *Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 62 L. Ed. 372 (1918). As long as it is clear that the opinion of the expert is expressed in terms of probabilities, the opinion should be submitted into evidence for a jury's consideration." (Citation omitted.) *Struckman* v. *Burns*, supra, 555; see also *State* v. *Weinberg*, 215 Conn. 231, 245, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990) ("[a]n expert witness is competent to express an opinion, even though he or she may be unwilling to state a conclusion with absolute certainty, so long as the expert's opinion, if not stated in terms of the certain, is at least stated in terms of the probable, and not merely the possible" [internal quotation marks omitted]); *Aspiazu* v. *Orgera*, 205 Conn. 623, 632–33, 535 A.2d 338 (1987) ("[w]hile we do not believe that it is mandatory to use talismanic words or the particular combination of magical words represented by the phrase reasonable degree of medical certainty [or probability] . . . there is no question that, to be entitled to damages, a plaintiff must establish the necessary causal relationship between the injury and the physical or mental condition that he claims resulted from it" [citation omitted; internal quotation marks omitted]).

"For medical opinion testimony to have any probative value, it must at least advise the jury that the inference drawn by the doctor is more probably correct than incorrect. If the probabilities are in balance, the matter is left to speculation." (Internal quotation marks omitted.) *Healy* v. *White*, 173 Conn. 438, 444, 378 A.2d 540 (1977). As an example, in *Davis* v. *P. Gambardella & Son Cheese Corp.*, 147 Conn. 365, 373, 161 A.2d 583

(1960), we held that there was insufficient evidence for a jury to determine whether the plaintiff had suffered a permanent injury when the doctor only could testify that there was a " 'fifty-fifty chance' " that the injury sustained would be permanent. "This finding afforded no basis for an award of damages"; id.; because the expert testimony was "based on pure speculation." *Aspiazu* v. *Orgera*, supra, 205 Conn. 632. In contrast, this court found sufficient evidence to uphold a jury finding of a permanent injury when one doctor testified that "there is a better than 50 percent chance that this [child's injury will be permanent]"; *Healy* v. *White*, supra, 442; and a second doctor testified to "a better than 60 percent chance" of a permanent injury. Id. "The fact that the experts testified as to 'odds' and percentages was acceptable"; id., 444; because the testimony was "clearly in terms of the probable permanence of the [plaintiff's] conditions." Id.

Testifying in terms of odds, however, can be just as unnecessary as using the phrase "reasonable medical certainty." In *Ardoline* v. *Keegan*, 140 Conn. 552, 553, 102 A.2d 352 (1954), the plaintiff brought a malpractice action charging that the defendant doctor improperly had prescribed the drug pontocaine as a nasal spray. An expert was called to testify as to the standard of care regarding the use of pontocaine. When asked in what manner is the drug administered in Connecticut, the doctor responded " 'it's never administered by spray.' " Id., 555. This court concluded that this testimony "was enough evidence on the subject [of the standard of care] to permit the case to go to the jury." Id., 558. *Ardoline* makes clear that it is not the term "reasonable medical certainty" that is critical when reviewing expert testimony, but what the substance of the testimony conveys.

Although we agree with the defendant that neither expert witness *specifically* linked the victim's symp-

toms to chloral hydrate with the term "reasonable degree of medical certainty," we conclude, however, that the *substance* of the testimony of the experts was that, to a reasonable medical certainty, the symptoms experienced by the victim were *consistent* with those of chloral hydrate. As we explain in the following discussion, this was sufficient in the present case.

We turn first to a discussion of the consistency between the victim's testimony and the enumerated effects of chloral hydrate. As was discussed at length previously, the victim's complaints of drowsiness, dizziness, fogginess, only partial recall of events, nausea, vomiting and lack of a "hangover" were consistent with the effects of chloral hydrate, as detailed by the physicians. Although some questions posed to the experts by the state were couched in terms of possibilities rather than probabilities, a fair reading of their testimony demonstrates that most of their answers were not expressed in terms of possibilities, but articulated a likelihood that the symptom described was consistent with the effects caused by the ingestion of chloral hydrate.

For example, O'Brien stated that after ingesting chloral hydrate "*you'd* become drowsy rather rapidly. *You'd* become drowsy and start to drift off into sleep." (Emphasis added.) When asked if it was "possible for someone to experience dizziness," O'Brien stated: "It would be more likely that you would be simply drowsy not describe it as dizzy unless, depending on the dose, if you increase the dose then *you're going to* become dizzy and weak and *you'll have* other effects . . . ." (Emphasis added.) When asked if it would be *possible* for the drug to affect someone's memory, O'Brien testified: "You don't remember very much what's happening

when you're dozing off or you're sound asleep."[18]

[18] Two additional passages aptly demonstrate that, despite the wording of the questions in terms of possibilities, O'Brien answered them in a manner suggesting that he believed it more probable than not that chloral hydrate would cause the symptoms being discussed. Furthermore, on several occasions, he directly stated that the symptoms in question were consistent with chloral hydrate ingestion. When asked by the state's attorney about the effects of chloral hydrate on the body, O'Brien testified as follows:

"Q. In a situation if someone had been administered chloral hydrate and did not fall asleep, could that happen hypothetically?

"A. Sure. If the dose wasn't high enough, where you were so excited you needed more, sure. You don't necessarily have to go to sleep, but I would expect you to.

"Q. And could there be a situation where a person was being aroused or at least spoken to or have contact with another person, would that then inhibit their ability to fall asleep?

"A. Yeah. You could certainly stimulate them or it's like going to sleep with an average dose. I could arouse you . . . or make noise and wake you [up] or bring you back for a short period of time. You may doze off again, sure.

"Q. In situations such as that, if a person were to ask to walk, if a person were to maintain a memory span, would the chloral hydrate affect their ability to recall things?

"A. You may have a vague memory depending on your state of arousal at the time you were doing it. You may have a vague memory. It's like somebody coming into the room when you were asleep, you may remember that, you may not, depending on how deep you were. You'll have some recall of something. It probably won't be full recall. It may be cloudy. . . .

"Q. Based upon your medical experience, you stated that one of the effects of chloral hydrate was on the brain.

"A. That's correct.

"Q. Could that also impair someone's ability to have a concept of time.

"A. Yes.

"Q. On the passage of time?

"A. Sure.

"Q. Could it also affect someone's ability to concentrate?

"A. Yes. . . .

"Q. Could it affect someone's ability to maintain a thought to stay focused?

"A. Yes. You couldn't stay focused while you're falling asleep. It would be like trying [to] read a book and concentrate or focus [in] on the TV, you know, if I'm tired, turn on the TV.

"Q. And those symptoms are consistent with chloral hydrate administration?

"A. Yeah, sure."

Later, when testifying about the duration of the effect of chloral hydrate, O'Brien responded to the state's attorney's questions as follows:

Although the questions could have been phrased more adeptly, "by looking at the entire substance of the [experts'] testimony"; *Struckman* v. *Burns*, supra, 205 Conn. 555; we conclude that the experts testified to a reasonable medical certainty that the symptoms experienced by the victim were consistent with those likely to result if one were administered chloral hydrate.[19]

The defendant argues that this is not sufficient; that the experts must have gone one step further, and testified to a reasonable medical probability that chloral hydrate was the cause of the victim's symptoms, especially when: (1) there had been no testing done for the presence of chloral hydrate, and, in fact, the symptoms complained of by the victim would not have warranted such testing; and (2) there were significant inconsistencies between the physicians' testimony and the victim's symptoms. We disagree.

"Q. Clinically speaking from your experience, after the administration of chloral hydrate, normally, how long would it take for someone to experience the effects of the drug?

"A. Well, the half-life or the time it remains in the system, about four hours, four to six hours, and that correlates pretty much with the amount of time you would be asleep. So we're saying four to six hours somewhere in there. . . .

"Q. Following a period of sleep after the administration of chloral hydrate, would you expect the patient or the person who had taken that substance to experience any lingering effects?

"A. Period of time, you mean how long?

"Q. Following four to six hours of effectiveness of the drug that you had testified to?

"A. Normal dose, most people don't have any effects afterwards. In that sense it is a good hypnotic, you went to sleep fairly quickly, you had a little hangover, it was short duration, so you could go to work not hung over.

"Q. And that's consistent with chloral hydrate?

"A. Yes, it is.

"Q. Now, could this drug aggravate a preexisting stomach problem, an ulcer problem?

"A. Yeah. It certainly would. The drug is very irritating."

[19] We note that at no time did the defendant object to the form of questioning as occasionally phrased in terms of possibilities. The evidence, therefore, was properly admitted.

Before addressing the defendant's specific complaints concerning the circumstances surrounding this case, we address the defendant's broad contention that, to prove the ingestion of a drug, there must be some testimony that, to a reasonable medical probability, the victim ingested that drug, not simply that the symptoms the victim displayed were consistent with that drug. Such testimony is often impossible to come by because typically a variety of drugs are capable of producing the same symptoms. As O'Brien admitted in the present case, it was possible that some drug other than chloral hydrate caused the effects experienced by this victim. As long as there is testimony to a reasonable medical probability that the victim's symptoms are consistent with those corresponding to a specific drug, however, that testimony, along with other circumstantial evidence, may be sufficient to support the jury's verdict.

For us to conclude otherwise would be to enact an unduly high bar to prosecutions where otherwise sufficient medical testimony and circumstantial evidence is available to prove beyond a reasonable doubt the guilt of the defendant. This rule is necessary especially in light of the recent significant increase in the use of controlled substances to commit assaults. See Controlled and Uncontrolled Substances Used to Commit Date Rape: Hearings on H.R. Rep. No. 1530 Before the Subcommittee on Crime of the Committee on the Judiciary, 105th Cong., 2d Sess. (1998).

As an example, in Sera v. State, 341 Ark. 415, 17 S.W.3d 61, 76 (2000), the Arkansas Supreme Court rejected a sufficiency of the evidence claim regarding the defendant's conviction for administering a controlled substance, the date rape drug Rohypnol, to the victim, and engaging in sexual intercourse with the victim who was incapable of consenting due to the drugs. The victim testified that she went out to dinner with the defendant. She recalled having a glass of wine and

a glass of water at dinner. At one point, the victim left the table to go to the bathroom. When she returned she finished her water and soon thereafter began feeling ill. After remembering leaving the restaurant and getting into the defendant's car, the victim could not recall any further details until the next morning, when she woke up in bed with the defendant. Id., 65. The fact that the victim was unable to testify as to what had transpired between herself and the defendant was not dispositive. As the state argued in *Sera*, "because Rohypnol prevents victims from recalling most or all events once the drug takes effect . . . reversing the conviction based on [the victim's] inability to recall the events of that night would allow [the defendant] to have planned, executed and been held blameless for the perfect rape." (Internal quotation marks omitted.) Id., 75.

Furthermore, as in the present case, there was no specific testimony that to a reasonable medical probability the victim had ingested Rohypnol. In fact, one of the state's experts, after viewing a videotape secretly made by the defendant showing him having sex with the victim, and reviewing the victim's description of events, could only testify that "the victim's behavior was consistent with the effects of Rohypnol." Id., 72. Another expert, a pharmacologist who had created a test to detect Rohypnol in urine, testified, after viewing the videotape, that "it was possible that [the victim was] under the influence of Rohypnol, but could not rule out different drugs as well." Id., 71. Despite the absence of any more precise testimony, the Arkansas Supreme Court concluded that "[t]he evidence was not such that the jury was reduced to mere speculation and conjecture"; id., 75; noting that, among other facts, the defendant was in possession of Rohypnol during the relevant time period and that the victim's symptoms and behavior on the videotape were consistent with the ingestion of Rohypnol. Id., 75–76; see also *People* v. *Wojahn*, 169

Cal. App. 2d 135, 141, 337 P.2d 192 (1959) (Rape conviction was upheld on sufficiency of the evidence grounds where the defendant physician raped the victim after administering an unknown drug to her leaving her unable to resist. "The fact that [the victim] was not given any tests for drugs on the day of the attack . . . is not fatal to the prosecution's case. Generally, from the very nature of the offense there can be no direct evidence of the administration of a drug.").

Therefore, as the court in *Sera* had concluded, the fact that chloral hydrate was not tested for in the present case is not determinative. As O'Brien testified, in 1993, it was not part of the standard drug screen to test for chloral hydrate and "[n]obody would have tested for it without some other information or indication." On cross-examination, O'Brien stated that, based upon the medical history that the victim had given the doctor, "[t]here was no information that would indicate chloral hydrate, that's correct. There was no reason to test for chloral hydrate as a specific drug."

The defendant argues that, if a doctor would not even test for chloral hydrate based on the symptoms described by the victim, a jury could not determine beyond a reasonable doubt that chloral hydrate had caused the victim's symptoms. We disagree with the defendant's characterization of this testimony. O'Brien was merely saying that, because there were other drugs that could have caused the victim's symptoms, without additional information it would have been unreasonable to test for every drug that could have caused those symptoms.[20]

---

[20] As to the reasoning behind not testing for chloral hydrate, O'Brien responded to the defense attorney's questions as follows:

"Q. You indicate that based upon the history this woman gave, the doctor was perfectly correct in not testing for chloral hydrate. Right?

"A. There was no information that would indicate chloral hydrate, that's correct. There was no reason to test for chloral hydrate as a specific drug. Correct.

"Q. Based upon what the woman told the doctor. Right?

We also disagree with the defendant's assertion that a jury properly could not weigh inconsistencies between the victim's testimony and the effects of chloral hydrate, notably on the issues of smell, taste and time lapse. As we discussed previously, these few discrepancies were explained by the experts in such a way that a lay jury could understand and determine if there were any inconsistencies, and, if so, evaluate their significance. On the basis of the experts' testimony, we conclude that the jury could have found that the victim's symptoms and those attributed to chloral hydrate were consistent to a reasonable medical certainty.

"A. That's correct.

"Q. So if you got the history from the woman you would not have tested for chloral hydrate, either. Right?

"A. With that information, I certainly would not.

"Q. Based upon what she told the people in the hospital, there was insufficient evidence to believe she had been administered chloral hydrate to even test for it. Right?

"A. That's not correct. There was not an indication that she took it. There was no information to say she didn't. That's completely incorrect. Chloral hydrate was not an issue because there was no indication that she took that particular drug. She certainly was tested for other substances of abuse. . . .

"Q. You agree that based on the history she gave as to what happened or you agree that they shouldn't have tested for chloral hydrate. Right?

"A. Without somebody telling him they took chloral hydrate or finding out about, you would not test for it. That's correct. . . .

"Q. Well, she indicated she thought she'd been drugged. Right?

"A. That's correct.

"Q. And chloral hydrate is a drug that can sedate or put people to sleep. Right?

"A. That's correct.

"Q. And she told him that she had been given something and had fallen asleep. Right?

"A. That's correct.

"Q. So you believe that based on that, there was no reason to test for chloral hydrate. Right?

"A. No more than there was for Prozac.

"Q. Did I ask about Prozac?

"A. I know you didn't but you're drawing the inference it was an indication not to test for it and that is not true. . . .

"Q. So I take it what you're saying is unless this lay person came in and said I think I've been given chloral hydrate, one would not test for it. Right?

"A. That's pretty much true."

Although there may be a case in which expert testimony will be required on the issue of whether a victim ingested a particular substance, this is not such a case. Given the facts that the jury reasonably could have found, there was sufficient evidence from which the jury reasonably could have concluded that the defendant had caused the victim to ingest chloral hydrate.

## II

We next address the question of whether the trial court improperly allowed testimony regarding a prior incident of uncharged misconduct by the defendant. The Appellate Court, in reversing the defendant's conviction on the assault and illegal distribution charges on grounds of sufficiency of evidence, did not reach this claim. *State* v. *Nunes,* supra, 61 Conn. App. 676 n.18. Although not part of the certified issue, because the parties have fully briefed it, and in the interest of judicial efficiency, we address this claim, and we conclude that the trial court did not abuse its discretion in allowing the testimony.

The following additional facts are relevant to our resolution of this issue. On September 25, 1997, the defendant filed a motion in limine to exclude any evidence of prior misconduct. That same day, outside the presence of the jury, the trial court heard testimony from W,[21] which can be summed up as follows. W first met the defendant in the fall of 1990 at the Hartford police station. She recently had graduated from college with a communications degree in television and was looking for opportunities to gain experience. Although she had a full-time job, she arranged an informal internship at the Hartford police station. W helped produce training tapes and other video products with the defendant, as her schedule permitted.

---

[21] In the interest of preserving the privacy of the witness, we refer to her by her last initial only.

Sometime in the fall of 1991, W, as was her custom, called the police station to see if the defendant was available to do some video work. After determining that the defendant was at the police station, W arrived there sometime between 6 p.m. and 7 p.m., and went up to the defendant's office on the second floor. While talking with the defendant, W mentioned to the defendant that she was cold. The defendant offered her a drink of hot chocolate, which she accepted. The defendant took a packet of hot chocolate from his desk drawer, took a paper cup and then left his office to get some hot water from the water cooler down the hall. The defendant was out of W's view for one to two minutes, returning with the hot chocolate already prepared.

W drank the hot chocolate over a period of approximately ten minutes. Within thirty minutes of finishing the hot chocolate, W began to feel "[l]ight-headed, dizzy. I mean it got to the point where I felt like I was going to pass out. I could not keep my eyes open." When W told the defendant how she was feeling, the defendant asked her if she wanted to lie down. When W indicated that she did, the defendant took hold of W's arm and brought her to a classroom containing desks, chairs, chalkboards and some blue gym mats. W laid down on one of the open mats and fell asleep. The next thing W recalled was waking up approximately two hours later. The defendant was sitting next her, with his hand on her stomach, over her clothing. None of her clothing was in disarray. After another twenty minutes, W felt well enough to leave the police station, and drove home. Upon arriving at home, she immediately went to bed. At no time did she feel like vomiting. She awoke the next morning feeling "perfectly fine."

W also testified that, on the night in question, she had felt "fine" when she arrived at the police station; she was not feeling dizzy or light-headed, nor did she have a head cold or inner ear infection. W claimed that

she previously never had experienced the feelings she felt that night, and had not experienced them since.

The trial court heard arguments on the motion in limine outside the presence of the jury. The state offered the testimony of W on the assault and illegal distribution charges "to show the intent of the defendant and common scheme." After hearing arguments, the trial court permitted W's testimony to be admitted. W testified, before the jury, to essentially the same facts as previously described. Immediately after W's testimony, the trial court gave the jury a cautionary instruction, ordering it to consider the testimony of W "solely to show or establish evidence on the issue of the existence of intent," and then only as to the assault and illegal distribution charges.[22]

We begin our review of the trial court's action by noting that "[a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. *State* v. *Kulmac*, 230 Conn. 43, 60, 644 A.2d 887 (1994). Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. *State* v. *Brown*, 199 Conn. 47, 56, 505 A.2d 1225 (1986). Evidence may be admissible, however, for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudi-

---

[22] We note that there is some inconsistency between the trial court's ruling on the admissibility of this evidence, and its instructions to the jury. At argument on the defendant's motion in limine, the trial court stated: "The evidence of *common scheme* and *motive, system of criminal activity* will be allowed in with the proper cautionary instruction to the jury on the appropriate counts." (Emphasis added.) The court, however, instructed the jury only on intent. Neither party took exception to these instructions. We need not resolve this discrepancy because we conclude that the evidence was admissible to prove intent. For purposes of this opinion, we treat the evidence as admitted only for that purpose.

cial tendency. . . . *State* v. *Jones*, 205 Conn. 638, 660, 534 A.2d 1199 (1987)." (Internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 790, 785 A.2d 573 (2001).

In order to determine whether such evidence is admissible, we use a two part test. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983). Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . . *State* v. *Jones*, supra, 205 Conn. 660." (Internal quotation marks omitted.) *State* v. *George B.*, supra, 258 Conn. 790–91.

"The first prong of the test requires the trial court to determine if an exception applies to the evidence sought to be admitted." *State* v. *Kulmac*, supra, 230 Conn. 61. In the present case, the trial court admitted the evidence concerning the defendant's encounter with W on the issue of intent. The state contends that the incident with W was relevant on the issue of intent because it could be used by the jury in conjunction with the victim's testimony to eliminate other possible causes of the victim's symptoms, such as illness or the victim's self-administration of some substance. We agree.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either

more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995)." (Internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 788–89, 699 A.2d 91 (1997).

W's testimony was relevant on the issue of intent. From W's testimony, the jury reasonably could have inferred that the defendant, with the intent to render her physically helpless, administered some substance to her that caused her to feel light-headed, dizzy and very sleepy, and be amenable to his suggestion to lie down and fall asleep on a gym mat in a nearby room. From this, the jury could have inferred that the defendant had a similar intent with respect to the victim.

Furthermore, W's testimony was relevant to rebut a suggestion that the victim's symptoms were caused by some factor or factors other than the defendant's intentional conduct. The victim testified that, when she told the defendant that she was feeling ill, the defendant claimed that her symptoms were being caused by the new printer in his office. During cross-examination of the victim, she was questioned at length concerning what she ate that day and whether she was taking vitamins or vitamin supplements. When the defendant took the stand, although confirming portions of the victim's story, he denied administering any kind of drug to her. He also stated that the victim told him that she had taken megavitamins and Geritol. Moreover, at closing arguments, the defense attorney characterized the evidence as follows: "Where's that leave you with [the]

evidence? Anecdotal stuff. Maybe like me, she had a bug. Maybe she didn't eat enough that day and had some frozen pizza and then gulped down some ice tea. Maybe she was drugged." Because intent was a contested issue in this case, the trial court reasonably could have determined that W's testimony was relevant to prove intent, because it tended to disprove that the victim's symptoms were caused by fumes from the laser printer, or were the result of illness or of the victim's self-administration of some substance.

The defendant does not dispute that, with the proper foundation, W's testimony would be relevant. Rather, relying on the state's concession that "we cannot tie any substance to the incident with [W]," the defendant argues that W's testimony was not relevant to the issue of intent because there was no evidence from which the jury reasonably could infer that the defendant had drugged her. In support of this assertion, the defendant cites *State* v. *Wilson*, 199 Conn. 417, 449, 513 A.2d 620 (1986), for the proposition that, before evidence of prior misconduct can have any relevance, there must be a preliminary showing that the defendant caused the prior injury.

In *Wilson*, the defendant was convicted of manslaughter in the death of his girlfriend's baby daughter. Id., 419. During the trial, the court admitted evidence of prior injuries that both the victim and her three year old sister had suffered. Id., 448. We reversed the conviction because the evidence showed that, although both the victim and her sister had been abused on numerous occasions, the act of abuse had not always been committed by the defendant. Id., 450. We therefore required that, before any evidence of prior injuries could be admitted, a showing that the injury was inflicted by the defendant was required. Id. In so holding, we stated that, "[this] evidence of causation may be circumstantial or direct." Id., 449.

*Wilson* is, in our view distinguishable. First, in the present case, there is no evidence suggesting that the prior misconduct was engaged in by a third person. Second, in the present case, W's testimony reasonably permitted the inference that, under similar circumstances, the defendant engaged in intentional conduct similar to a form of the intentional conduct that the state was required to prove, namely, the administration of a liquid drink to a young female in order to render her physically helpless.

Having determined that the evidence of prior misconduct by the defendant was relevant, we turn to an examination of its prejudicial impact. "In admitting such evidence, the trial court's discretion is limited. *State* v. *Sierra*, 213 Conn. 422, 435, 568 A.2d 448 (1990). The trial court's discretion to admit other crimes evidence imports something more than leeway in decision-making. Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . When assessing the admissibility of other crimes evidence, the application of a mechanical test determining that the proffered evidence fits within some class of exception to the rule of nonadmissibility, may obscure sight of the underlying policy of protecting the accused against unfair prejudice. That policy ought not to evaporate through the interstices of the classification. The problem is thus one of balancing the actual relevancy of the other crimes evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Internal quotation marks omitted.) *State* v. *Baldwin*, 224 Conn. 347, 356–57, 618 A.2d 513 (1993). In the present case, the trial court heard a lengthy offer of proof followed by arguments of counsel. It balanced the probative and prejudicial testimony before reaching its conclusion.

Additionally, the trial court instructed the jury on the limited use of W's testimony, both immediately after W testified, and then in its final instructions to the jury. See *State* v. *Kulmac*, supra, 230 Conn. 63; *State* v. *Baldwin*, supra, 357. Under these circumstances, we conclude that the trial court did not abuse its discretion by permitting the state to introduce W's testimony.

The defendant disagrees with our conclusion that the trial court balanced the probative value of W's testimony against its prejudicial impact. The defendant suggests that, unless there is an explicit, "on-the-record analysis of the probative value/prejudice issue by the trial judge"; *United States* v. *Robinson*, 700 F.2d 205, 213 (5th Cir. 1983), cert. denied, 465 U.S. 1008, 104 S. Ct. 1003, 79 L. Ed. 2d 235 (1984); the trial court has necessarily "abused its discretion by not performing the necessary balancing test." *State* v. *Sierra*, supra, 213 Conn. 436. We disagree.

In *Sierra*, we reversed the defendant's conviction because the trial court admitted prior misconduct evidence by the defendant without "performing the necessary balancing test." Id. Noting that "the balancing process is critical to the determination of whether other crime evidence is admissible"; id.; we concluded that the trial court abused its discretion in admitting the prior misconduct evidence where a review of the record "reveal[ed] that the court recognized that the evidence was prejudicial, but made no effort to consider the nature of the prejudice or to weigh the prejudice against the probative value of the other crime evidence." Id. Compare *State* v. *Baldwin*, supra, 224 Conn. 357 ("[t]he record reflects that the trial court carefully balanced the probative value of the evidence against the prejudicial effect and determined that the prejudice did not outweigh its probative value"). We do not read *Sierra* or *Baldwin* as requiring a trial court to use some talismanic phraseology in order to satisfy this balancing

process. Rather, these cases simply stand for the proposition that, in order for this test to be satisfied, a reviewing court must be able to infer from the entire record that the trial court considered the prejudicial effect of the evidence against its probative nature before making a ruling.

Turning to the trial court's actions here, we conclude that a fair reading of its questioning concerning the motion in limine demonstrates that, overlaying the entire discussion and consideration of the issue, was its understanding of its responsibility to weigh both the probative and prejudicial nature of the proffered testimony. Our review of the record persuades us that the trial court properly undertook an appropriate balancing analysis.

Lastly, the defendant claims that, even if the trial court did weigh the probative value of W's testimony against its prejudicial effect, it abused its discretion in admitting the testimony. We disagree. W's testimony was offered on the issue of intent. In this case, "[i]ntent was a crucial element in the crime charged. In order to meet its burden of proving intent, the state was forced to rely on probative inferences, since the circumstances under which the crime allegedly took place effectively prohibit direct evidence." *State* v. *Tucker*, 181 Conn. 406, 416, 435 A.2d 986 (1980). "Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." *State* v. *Baldwin*, supra, 224 Conn. 355. This is especially true in cases such as this where a drug is administered that not only inhibits the victim's memory, but also can be difficult to detect in the system after a relatively short period of time. Additionally, there was no other equally probative but less prejudicial evidence available to the state. This fact further supports the trial court's actions. *State* v. *Tucker*, supra, 417 ("[T]he exercise of wise discretion requires the trial

court to consider whether other evidence, equally probative and less prejudicial, was available to the state. . . . The absence of such an alternative in this case lends additional support to the action of the trial court." [Citation omitted.]). We further note that the trial court did give specific limiting instructions as to the use of this testimony in order to minimize its prejudicial impact. See *State* v. *Kulmac*, supra, 230 Conn. 63; *State* v. *Baldwin*, supra, 357. We conclude, therefore, that the trial court did not abuse its discretion in determining that W's testimony was more probative than prejudicial and, therefore, admitting it at trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.